Sondra L. **MATOVICH**, Appellant–Plaintiff,

v.

Elizabeth A. **RODGERS**, Appellee–Defendant.

No. 53A01–0205–CV–182.

Court of Appeals of Indiana.

Feb. 26, 2003.

Robert T. Miller, R.T. Miller & Associates, Bloomington, IN, Attorney for Appellant.

John W. Richards, Holly M. Harvey, Bunger & Robertson, Bloomington, Indiana, Attorneys for Appellee.

## OPINION

ROBERTSON, Senior Judge.

*STATEMENT OF THE CASE*

Sondra L. Matovich appeals the trial court's denial of her motion seeking a new trial in the negligence action she brought against Elizabeth A. Rodgers after the jury returned a verdict awarding her damages in the amount of $586.16.

*ISSUE*

Whether the trial court erred in denying Matovich a new trial because the amount of damages awarded is inadequate as a matter of law.

*FACTS*

On the evening of January 21, 1998, Rodgers ran a red light at an intersection in Bloomington, and her vehicle struck one driven by Matovich. Matovich walked to a nearby gas station and called the police. Rodgers was ticketed. Matovich experienced no "pain or discomfort" that night. (Tr. 22).

The next day, after sitting in a university class for 90 minutes, Matovich felt pain in her neck and shoulders. She went to PromptCare, where x-rays of her right shoulder and spine were taken. The radiologist reported that the cervical spine was normal. The physician noted that her neck was supple, and he diagnosed a cervical strain. Matovich was given pain and muscle relaxant medication. On February 4, she returned to PromptCare, where a second physician saw her, reviewed the x-rays, noted that Matovich had a normal range of movement, and gave her a different prescription. No recommendation as to any other medical treatment was given to her by the physicians.

On February 24, at the suggestion of "friends and relatives," Matovich went to Dr. Lucinda Jordan, a chiropractor. (Tr.

26). Matovich complained to Dr. Jordan "about upper back and neck pain." (Tr. 55). Upon examination, Dr. Jordan found some reduction in Matovich's range of motion in turning her head left as well as weak muscles in various areas. Reviewing a full spinal x-ray, Dr. Jordan believed it showed scoliosis, or curvature, in Matovich's spine, "possibl[y] ... acquired ... since the accident." (Tr. 55). After her first few visits to Dr. Jordan, Matovich reported feeling better. By August of 1998, Matovich "said that she felt ninety percent better." (Tr. 79). Nevertheless, Matovich continued to see Dr. Jordan on a frequent basis over the next several years.[1] Matovich described her treatments as "mainly manipulation," "some supplements," and "hot packs for [her] muscles," as well as the occasional ultrasound. (Tr. 28).

On January 19, 2000, Matovich filed a complaint against Rodgers. She sought damages for injuries suffered "as a direct and proximate result" of Rodgers' negligent operation of her vehicle on January 21, 1998.

In December of 1999, Matovich married and obtained insurance coverage through her husband. On May 18, 2001, she went to see Dr. Peter Frechette "to get established with a family physician." (Tr. 45). She told Dr. Frechette she had "two specific concerns:" multiple environmental allergies and "some small lower extremity varicosities." (Ex. A., Tab 5). She also "mentioned" to him that she was being treated by Dr. Jordan for discomfort in her neck since an automobile collision. (Tr. 45). According to Dr. Frechette's records, his examination noted no problems as to her "back/extremities" and that

her neurological function was "grossly intact." (Ex. A., Tab 5). On June 25, 2001, Matovich returned to Dr. Frechette complaining about "chronic constant neck pain" on her left side since the January 1998 collision. *Id.* Dr. Frechette's notes report her chiropractic treatment, that she had "never had orthopedic or PT evaluation or treatment," and that she "ha[d] no neurological deficits of the upper extremities." *Id.* Nevertheless, Matovich said she "would like an MRI of the C spine on the advice of her attorney," and Dr. Frechette ordered one. *Id.* The report thereof stated the MRI showed a "minimal" herniation of Matovich's right C5–6 disc. *Id.* Dr. Frechette left the practice, and Matovich next saw his associate, Dr. Joseph Long, about the MRI results. Dr. Long "strongly advised [Matovich] to consult her attorney and if the attorney felt it was appropriate," he would refer her to a neurosurgeon for evaluation. *Id.* Matovich then saw Dr. Thomas Leipzig, a neurosurgeon, on October 22, 2001; his examination found she had full range of motion of the cervical spine and normal motor function in the upper extremities. *Id.* Dr. Leipzig ordered a cervical myelogram; he found the myelogram and post-myelogram CT scan "essentially unremarkable." *Id.* It showed "no neurological deficits" and "no pressure" on Matovich's nerves. (Tr. 52).

According to Matovich, she incurred the following medical expenses: $4,157.27 for Dr. Jordan; $266 for PromptCare; $26.83 for prescriptions written by PromptCare; $501 for Drs. Frechette and Long; $196 for Dr. Leipzig; $1,487.25 for the MRI; and $1,475.75 for the myelogram and CT procedures. These total $8,110.10.

---

1. From late May of 1998 until January of 2000, when she did not live in Bloomington but in northwest Indiana, she did not seek any alternative health care provider. During

that time, she made 12 trips to Bloomington to see Dr. Jordan, traveling three hours each way to do so. When she lived in Bloomington in 2000, she saw Dr. Jordan 36 times.

A jury trial was conducted over the course of two days in February of 2002. The foregoing facts were adduced. Further, each juror was given a copy of all the medical records discussed, and the trial court gave them a period of time "to review" the records, advising them that they could "make written notes of matters on the documents" and that they would "see them again during deliberations." (Tr. 99). After Matovich concluded her presentation of evidence, she moved for judgment on the evidence with respect to negligence. The trial court granted the motion and held that "as a matter of law," Rogers was negligent. (Tr. 103).

The parties made their final arguments as to damages. The trial court instructed the jury on the concept of proximate cause, that it could "only award damages for injuries caused by" Rodgers, and that Matovich had "the burden of proving that her claimed condition was due" to Rodgers' negligence. (Tr. 127). It further instructed that the jury could not "allow any damages in this case which are remote, imaginary, uncertain, or conjectural or speculative in their nature, even though testified to by witnesses." (Tr. 128). The jury awarded Matovich damages in the amount of $586.16.

Matovich moved for a new trial, arguing that the jury's "award was not within the scope of the evidence, cannot be explained by any reasonable ground, and was, therefore, motivated by passion, partiality, corruption, or the consideration of some other improper element." (App. 11). The trial court "fail[ed] to find that the jury's verdict [wa]s against the weight of the evidence," "declin[ed] to substitute its judgment for that of the jury," and denied her motion. (App. 20).

## DECISION

■ When we consider the appeal of a jury verdict containing a damages award that the appellant claims is inadequate, we apply a strict standard. *Ritter v. Stanton,* 745 N.E.2d 828, 843 (Ind.Ct.App.2001), *trans. denied, cert. denied* —— U.S. ——, 122 S.Ct. 2357, 153 L.Ed.2d 179. Specifically, we "consider only the evidence that supports the award together with the reasonable inferences therefrom." *Id.* "If there is any evidence to support the amount of the award, even if it is conflicting, this court will not reverse." *Id.* This standard reflects the premise that damages "are particularly a jury determination." *Sears Roebuck and Co. v. Manuilov,* 742 N.E.2d 453, 462 (Ind.2001). Therefore, we do not substitute our "idea of a proper damage award for that of the jury." *Id.* (quoting *Prange v. Martin,* 629 N.E.2d 915, 922 (Ind.Ct.App.1994), *trans. denied* ). Because appellate courts are unable "to actually look into the minds of the jurors, . . . we will not reverse if the award falls within the bounds of the evidence." *Sears Roebuck,* 742 N.E.2d at 462 (quoting *Annee v. State,* 256 Ind. 686, 690, 271 N.E.2d 711, 713 (1971)).

■ To prevail on her claim against Rodgers, Matovich needed to show not only that Rodgers owed her a duty and breached that duty but also "that the breach proximately caused the plaintiff's injury." *Delta Tau Delta v. Johnson,* 712 N.E.2d 968, 970–71 (Ind.1999). Once Matovich proved that she was injured as a result of Rodgers having breached a duty to her, she was "entitled to damages proximately caused by" Rodgers' breach. *Bader v. Johnson,* 732 N.E.2d 1212, 1220 (Ind. 2000).

■ Matovich first claims that her damages must be held inadequate because, as in *Burris v. Riester,* 506 N.E.2d 484 (Ind. Ct.App.1987), *trans. denied,* "the defendant did not present any evidence refuting the plaintiff's medical bills." Matovich's

Br. at 6. However, in *Burris,* we found when her "bills of $751.49 for hospital, ambulance, optometric and other medical treatment immediate following her accident" were added to her "undisputed lost wages" of $209, the total exceeded the damages awarded, and those "initial medical expenditures and lost wages" had been the subject of "no legitimate dispute." 506 N.E.2d at 485, 486. Here, Matovich's "initial medical expenditures," the expenditures for PromptCare, the prescriptions therefrom, and her initial examination and treatments by Dr. Jordan do not exceed the amount awarded by the jury. Thus, *Burris* is not dispositive.

Matovich next directs us to *Neher v. Hobbs,* 760 N.E.2d 602 (Ind.2002), but in that case, as her brief states: "the jury returned a verdict for the plaintiff but awarded zero damages." Matovich's Br. at 7. Here, the jury did not award Matovich zero damages.

■ Matovich emphasizes that her medical expenses were "undisputed." *Id.* at 8. Indeed, there is no controversy that she incurred these expenses. However, it was Matovich's burden to prove by a preponderance of the evidence the expenses that were *incurred as a proximate result of the collision. See Manzo v. Estep,* 689 N.E.2d 474, 477 (Ind.Ct.App.1997) (after defendant's liability established, jury determines "damages that are directly attributable to the accident.")

After Matovich was treated by the physicians at PromptCare, there were no referrals for other treatment. Nevertheless, Matovich sought the care of Dr. Jordan at the suggestion of friends and family. Dr. Jordan testified that she had observed curvature, or scoliosis, of Matovich's spine in an x-ray taken more than a month after the accident. As to the onset of that scoliosis, Dr. Jordan said that it was "possible" it had existed before the collision,

"but, you know, who knows?" (Tr. 63). Dr. Jordan testified that she had ordered subsequent spinal x-rays of Matovich over the next several years, but no records thereof were provided. And none of the five physicians, including the neurosurgeon, to whom Matovich complained of neck pain made any findings of scoliosis.

Dr. Jordan did not refer Matovich to any other health care providers for additional treatment or testing. Matovich initially saw Dr. Frechette for reasons other than any neck pain, and Matovich later told him that her attorney had asked for an MRI. The MRI showed a minimal herniation of Matovich's disk, but there was no evidence of resulting pressure on the nerves in her spinal column. In addition, pressure on the spinal nerve root will produce radiating pain symptoms on the same side of the body as the pressure on the nerve, but the herniation to Matovich's disc was on the right side and her complained of pain was on the left side of her neck. Further, the herniation was first observed more than three years after the accident, and Matovich conceded, "[N]obody has ever given me any information as to what ... the cause is." (Tr. 46). Thus, the evidence does not require the conclusion that the collision caused the herniation. Finally, the tests undertaken by the neurosurgeon she had requested produced no other evidence of abnormality related to Matovich's stated complaints of neck pain.

Dr. Jordan's records and testimony support the inference that the injuries to Matovich that were proximately caused by the collision had resolved within the first couple of months. Even though Matovich testified that in 2001 she was still suffering from physical limitations related to the collision, she also testified that she was jogging for an hour or more on a regular basis. Based on the evidence presented, the jury could have concluded that only

Matovich's initial medical expenditures—from PromptCare, the prescriptions, and early examination and treatments by Dr. Jordan—were damages "directly attributable to" the collision. *See Manzo,* 689 N.E.2d at 477. The jury's damages award covers these damages. Because the evidence supports the damages awarded, we cannot find them inadequate as a matter of law. *See Sears Roebuck,* 742 N.E.2d at 462.

We affirm.

NAJAM, J., and VAIDIK, J., concur.