## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 12 2017, 9:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Diana C. Bauer
Bauer Legal LLC
Fort Wayne, Indiana

David L. Farnbauch
Sweeney Law Firm
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE

Patrick J. Murphy
State Farm Litigation Counsel
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joseph Spaulding,

*Appellant-Plaintiff,*

v.

Joseph Cook,

*Appellee-Defendant.*

December 12, 2017

Court of Appeals Case No.
02A03-1707-CT-1623

Appeal from the Allen Superior Court

The Honorable Nancy Eshcoff Boyer, Judge

Trial Court Cause No.
02D01-1311-CT-519

**Najam, Judge.**

# Statement of the Case

Following an automobile accident, Joseph Spaulding sued Joseph Cook, and, prior to trial, Cook stipulated that he was 100% at fault for causing the accident. At the conclusion of a trial on damages, the jury awarded Spaulding no damages. Spaulding filed a motion to correct error in which he alleged, in essence, that the verdict was inconsistent with the evidence and inadequate as a matter of law. The trial court denied that motion. Spaulding appeals and claims that the trial court abused its discretion when it denied his motion to correct error. We affirm.

# Facts and Procedural History

On June 8, 2012, Spaulding was driving approximately thirty miles per hour westbound on Independence Drive in Fort Wayne. As Spaulding entered the intersection with Centennial Drive he had the right-of-way, as there was no stop sign or traffic signal for traffic on Independence Drive. Cook was driving a full-size van on Centennial Drive, stopped at a stop sign, did not see Spaulding's car approaching the intersection, and proceeded into the intersection with Independence Drive. Despite last-second evasive maneuvers by both drivers, Cook's van collided with Spaulding's car. Cook later described the force of the collision as "mild" or "moderate." Plaintiff's Ex. 31 at 31; Tr. at 49. Spaulding's car sustained damage to the front fender and front part of the driver's-side door, and the rearview mirror was broken. Other than the front right bumper coming loose on one side, Cook's van sustained no damage. Spaulding was wearing his seatbelt and no part of his body hit anything in the

car as a result of the collision. Spaulding did not have any obvious injuries and did not seek medical attention that day.

[3] The next morning, Spaulding felt pain in his left shoulder when he tried to reach into his back pants pocket. Accordingly, that afternoon Spaulding went to the emergency room at Lutheran Hospital. Dr. Mary Wilger examined Spaulding's left shoulder and ordered X-rays, which "show[ed] nothing acutely." Plaintiff's Ex. 1 at 2. Dr. Wilger noted that Spaulding had "tenderness to palpation along the lateral aspect of the [left] shoulder" and "limited external rotation and very limited adduction" in the left shoulder. *Id.* at 1. Dr. Wilger gave Spaulding range of motion exercises to do at home and prescribed Vicodin for pain. Dr. Wilger instructed Spaulding to follow up with his family doctor in three to five days.

[4] A few days later, on June 12, Spaulding saw his family doctor, Dr. Naren Patel. Dr. Patel examined Spaulding and noted that, while he had full range of motion in his left shoulder, "he was having pain doing the shoulder movements" during the examination. Plaintiff's Ex. 32 at 10. Dr. Patel also noted that Spaulding had tenderness of the left trapezius muscle and in the left shoulder area. Dr. Patel injected cortisone into Spaulding's left shoulder area, prescribed Percocet and a muscle relaxer, and ordered physical therapy.

[5] Spaulding attended eleven physical therapy appointments between June 14 and July 23, and he followed up with Dr. Patel on June 26 and July 11. During the July 11 visit, Dr. Patel suspected that Spaulding had sustained a rotator cuff

injury, and he referred Spaulding to Dr. John Pritchard, an orthopedic surgeon. Spaulding made an appointment to see Dr. Pritchard on August 3.

[6] In the meantime, on his way to a physical therapy appointment on July 27, Spaulding was in another car accident. The brakes on Spaulding's truck were not working properly, and he rear-ended a stopped vehicle. Spaulding was traveling approximately five or ten miles per hour at the time of the collision. He did not sustain any injury, and he did not seek medical treatment.

[7] When Spaulding returned to physical therapy on July 31, he reported that he did not have "any pain" at that time and that he was "doing better." Plaintiff's Ex. 4 at 1. And during physical therapy on August 2, Spaulding reported that he did not have "any pain" at that time and that he "th[ought] things [were] working because he [was] having less pain overall with all activity, including reaching behind his back." Plaintiff's Ex. 5 at 1.

[8] On August 3, Spaulding saw Dr. Pritchard. Spaulding described the June 8 accident and stated that, since that accident, he had "experienced frequent left arm pain" but had improved with physical therapy. Plaintiff's Ex. 6 at 1. Spaulding described his pain as intermittent and said it was a six on a scale of one to ten. Spaulding did not tell Dr. Pritchard that he had been in another car accident on July 27. Dr. Pritchard suspected "some degree of rotator cuff pathology" and injected Spaulding's left shoulder with cortisone. *Id.* at 2. Dr. Pritchard instructed Spaulding to continue with physical therapy and to follow up with him in six weeks.

[9] On September 5, Spaulding returned to see Dr. Pritchard and reported "increased weakness and more discomfort" in his left shoulder. Plaintiff's Ex. 35 at 9. Accordingly, Dr. Pritchard ordered an MRI of Spaulding's left shoulder which revealed a "significant rotator cuff tear," a possible biceps tendon tear, and "moderate acromioclavicular joint arthrosis." *Id.* at 10. Dr. Pritchard surgically repaired the rotator cuff and biceps tendon injury on September 27.

[10] On November 21, 2013, Spaulding filed a complaint against Cook alleging that Cook's negligence caused his injuries. Cook filed an answer. On July 14, 2014, Spaulding filed an amended complaint and alleged that Cook had caused him to suffer "permanent injury to his left shoulder and left bicep area that required surgical intervention." Appellant's App. Vol. 3 at 14. Prior to trial, the parties stipulated that Cook was "100% at fault[.]" *Id.* at 19. But Cook denied responsibility for any damages allegedly incurred by Spaulding.

[11] At a jury trial on damages, Spaulding testified, and he presented the deposition testimony of his physicians, Dr. Patel and Dr. Pritchard. Dr. Patel testified that Spaulding's left shoulder injuries were caused by the June 8 accident. On cross-examination, Cook asked Dr. Patel about a history of injuries to Spaulding's *right* shoulder, which had led to surgery for a significant rotator cuff injury in that shoulder.

[12] In his deposition testimony, Dr. Pritchard testified in relevant part as follows:

Q: All right. Now, Dr. Pritchard, while we're on this list here of the procedures that you performed back on September 27th, which of these surgical procedures, in your opinion, were related to or caused by the trauma of the motor vehicle accident?

A: Well, of these procedures, the actual acromioclavicular [("AC")] joint arthritis, which means a hypertrophy of the joint, that we saw on X-ray, those findings were probably pre-existing the injury. I mean, it's almost a form of arthritis. So, it certainly didn't occur just in a couple months. Unfortunately, any trauma or injury to the shoulder can exacerbate it, so although the actual arthritis of the AC joint was pre-existing, you know, its subsequent removal still, I feel, has bearing on the injury, as does the rotator cuff and as does the biceps tendon, both which more than likely occurred at the time of injury.

Q: All right. Can a patient, particularly one who's, first of all, is it unusual for a seventy-six year old patient to have some degree of arthritis in an AC joint? Is that an unusual finding?

A: Not particularly.

Q: Okay. Can a patient have arthritis that shows up on an X-ray if you take an X-ray or an imaging study of the AC joint? Can a person have arthritis that shows up on an X-ray and be asymptomatic?

A: Absolutely.

Q: Okay. And "asymptomatic" means that they don't have any—

A: No pain.

Q: — stiffness or pain or whatever?

A: Correct.

Q: All right. And can trauma like the trauma that this gentleman had in this motor vehicle accident, can that cause arthritis in the AC joint to become symptomatic and painful?

A: Yes, it can.

Q: All right. And in your opinion, is that what happened in this case?

A: From the best of my records, again, this is the first time that I'm aware that he complained of pain of the shoulder subsequent to the accident. I had treated him for other things, but, again, to the best of my recollection, he had never had problems with the left shoulder before he had the accident. He tried various therapies, medications, and I would say that it is a result of the accident.

* * *

Q: . . . Do you believe that his trip to the emergency room the day after this collision, that that trip to the emergency room was necessitated by the trauma of the motor vehicle accident?

A: I do.

Q: Okay. And how about the visits to Dr. Patel after he went to the emergency room, leading up to the referral to you complaining of left shoulder pain? Do you believe those visits to his family physician were necessitated by the trauma of the wreck?

* * *

A: It seems to me that after, you know, a patient of this age was injured in a situation that he went to the emergency room, followed up with his family physician, you know, had some

treatment and then ultimately sent to me is consistent with him having had the injury.

Q: All right. And how about the same question. Dr. Pritchard, with regard to the physical therapy that he had at ONE prior to the time that you saw him? Do you believe that therapy was necessitated by the trauma of the collision?

A: Yes, I would say so.

Q: All right. And how about your charges for office visits and also the surgery that he had on September 27th? Do you believe those charges were related to the trauma of the motor vehicle collision?

\* \* \*

A: Yes, I would say they are.

Q: All right. And how about the physical therapy treatments, Dr. Pritchard, that you ordered after Mr. Spaulding underwent surgery on September 27th? Do you believe those physical therapy charges are necessitated by the trauma of the motor vehicle collision?

A: Yes, I do.

Q: How about the MRI that he underwent on September 5, 2012? Do you believe that was necessitated by the trauma of the motor vehicle collision?

A: Yes, I do.

Plaintiff's Ex. 35 at 15-27. On cross-examination, Cook asked Dr. Pritchard whether he had reviewed Dr. Patel's office notes, and Dr. Pritchard stated that

he had not done so. Cook confirmed that Spaulding had told Dr. Pritchard that he had been in a t-bone type accident at a speed of approximately twenty-five to thirty miles per hour and had not hit anything inside of his car. Cook confirmed that Spaulding had not informed Dr. Pritchard about Spaulding's July 27 accident during the August 3 office visit. Cook also asked Dr. Pritchard to describe Spaulding's history of rotator cuff injury in his right shoulder.

[13] In addition, this colloquy ensued:

> Q: . . . So, I understand the idea clearly of someone having conditions that may or may not have symptoms associated with them and you've been asked, I know, about the symptoms associated with the conditions that led to the surgery, but, just so I'm clear, of any of the conditions that are being identified on MRI or in the surgery, which of those do you believe were actually caused by a trauma from a car accident versus they already existed and were just made symptomatic by it?
>
> A: Well, the acromioclavicular joint arthrosis, by definition, is the description of the clavicle. It's not, it doesn't say it's painful. It doesn't say it's not painful, so I think that clearly pre-dated the accident. In terms of acute, you know, tendon type issues, the biceps tendon and the rotator cuff I feel were the specific acute issues associated with the accident.
>
> Q: Okay. So you believe the rotator cuff was torn in the accident?
>
> A: To the best of my knowledge, yes.
>
> Q: And you believe the biceps tendon was torn in the accident?
>
> A: Yes.

Q: In part, based upon the history that's provided to you?

A: Correct.

Q: Okay. Is there anything specific about the MRI or in your surgical findings that would allow you to date the onset or occurrence of those conditions themselves?

A: No.

Q: All right. Is there some way you can describe for the jury what the mechanics are that causes a rotator cuff to tear in the way of this one?

A: Well, actually, a rotator cuff can tear in a number of different ways. A vigorous eccentric contraction, you know, if someone is holding on very firmly, even to a steering wheel, and doesn't strike any particular object externally, with tensing of the muscles, that could potentially cause a rotator cuff to tear. Falling down a stairs, grabbing something can cause a rotator cuff to tear. So, anything that is more load than the rotator cuff can tolerate can cause a tear.

Q: Okay. So, obviously, one of those examples involved being inside of a car, so that's naturally of more interest to me than the others. So, what is it again, and I'm just trying to, I guess, push you a little further with the mechanics of it. Grabbing the steering wheel, you're saying you don't have to hit anything inside the car. Is it —

A: Yes, tensing, a vigorous, you know, acute muscle contraction, which, you know, certainly could occur by holding on to a steering wheel, you know, could cause a muscle to see more load than it can accept and cause a tear.

Q: Okay. So the biceps tear, the cuff tear, based on the history, you believe were caused by the accident?

A: Correct.

Q: Everything else you believe pre-existed it and either did or didn't produce symptoms that he didn't have before?

A: Much like someone falling on an arthritic knee joint. You know, when you bang up a, you know, any joint with X-ray evidence of arthritis, oftentimes it will become more symptomatic for a period of time.

*Id.* at 42-45.

[14] At the conclusion of the trial, the jury awarded Spaulding no damages. Spaulding filed a motion to correct error under Trial Rule 59(A)(2) and stated in part as follows:

1. That the jury's verdict of "zero" dollars and "zero" cents is to [sic] contrary to the evidence, clearly erroneous, and contrary to Indiana law in that:

a. The evidence is uncontroverted that Plaintiff sustained a left shoulder "strain" injury and left trapezius "strain" injury as a result of the June 8, 2012[,] motor vehicle collision;

b. The evidence is uncontroverted that Plaintiff experienced pain and was prescribed narcotic pain medication (Percocet) and received a cortisone injection into his left shoulder to treat his inflammation/pain on June 12, 2012, just 4 days after the subject motor vehicle collision.

c. The evidence is uncontroverted that between June 9, 2012[,] and July 23, 2012[,] Plaintiff incurred expenses for medical and therapy services (Lutheran Hospital, Emergency Medicine of Indiana, Summit Radiology, Dr. Patel and Orthopaedics

Northeast) totaling $4,818.50 (after Medicare write-offs/write-downs the accepted amount was $2,650.52).

d. The evidence is uncontroverted that the medical care and services Plaintiff received from Lutheran Hospital, Emergency Medicine of Indiana, Summit Radiology, Dr. Patel and Orthopaedics Northeast between June 9, 2012 and July 23, 2012[,] was treatment necessitated by the trauma of the June 8, 2012[,] motor vehicle collision.

e. The evidence is uncontroverted that the Plaintiff had no history of any preexisting left shoulder injury or left shoulder pain/symptoms prior to the subject June 8, 2012[,] motor vehicle collision.

f. No medical evidence was presented at trial to rebut the testimony of Dr. Naren Patel that the Plaintiff's left shoulder "strain" and left trapezius "strain" injuries he diagnosed on June 12, 2012[,] (just 4 day[s] post-collision) were caused by the trauma of the June 8, 2012[,] motor vehicle collision;

g. The Defendant presented no evidence other than the testimony of Joseph Cook.

h. In order for the jury to have reached the result that Plaintiff is entitled to "zero" dollars and "zero" cents, the jury would have had to disregard, entirely, the opinion of Dr. Naren Patel that Plaintiff's left shoulder "strain" and left trapezius "strain" injuries he diagnosed on June 12, 2012[,] (just 4 day[s] post-collision) were caused by the trauma of the June 8, 2012[,] motor vehicle collision;

i. In order for the jury to have reached the result that Plaintiff is entitled to "zero" dollars and "zero" cents, the jury would have had to disregard, entirely, the Lutheran Hospital emergency room record [Exh. 1 in the parties "Joint Exhibit Book"] authored by Dr. Mary Wilger, diagnosing Plaintiff as having an

"injury of left upper arm" just one day after the June 8, 2012[,] motor vehicle collision.

j. There was no cross examination or impeachment of Dr. Naren Patel's testimony undermining his opinion that Plaintiff's left shoulder "strain" and left trapezius "strain" injuries he diagnosed on June 12, 2012[,] (just 4 day[s] post-collision) were caused by the trauma of the June 8, 2012[,] motor vehicle collision;

k. The jury's verdict of "zero" dollars and "zero" cents is, in effect, a determination or decision that Plaintiff did not sustain a left shoulder "strain" or a left trapezius "strain" injury or any other type of injury as a result of the June 8, 2012[,] motor vehicle collision. The jury's decision or determination that Plaintiff did not sustain any injury whatsoever in the June 8, 2012[,] motor vehicle collision is contrary to the evidence, clearly erroneous, and contrary to law.

l. The jury's verdict of "zero" dollars and "zero" cents is, in effect, a determination or a decision that Plaintiff did not experience any physical pain whatsoever as a result of the injuries he sustained in the June 8, 2012[,] motor vehicle collision. The jury's decision or determination that Plaintiff did not experience any physical pain whatsoever as a result of the June 8, 2012[,] motor vehicle collision is contrary to the evidence, clearly erroneous, and contrary to law.

m. The jury's verdict of "zero" dollars and "zero" cents is, in effect, a determination or a decision that the medical care and services Plaintiff received from Lutheran Hospital, Emergency Medicine of Indiana, Summit Radiology, Dr. Patel and Orthopaedics Northeast between June 9, 2012[,] and July 23, 2012[,] is completely and totally unrelated to the June 8, 2012[,] motor vehicle collision. That determination or decision by the jury is contrary to the evidence, clearly erroneous, and contrary to law.

*Id.* at 24-27.

The trial court denied that motion following a hearing. In its order, the trial court stated in relevant part as follows:

> At trial Cook presented evidence that cast doubt upon the asserted severity of the impact, and that tended to undermine Spaulding's claim as to the speed of the accident. Testimony was further given which showed that Spaulding did not immediately report his injuries after the accident and did not immediately seek medical care. These facts may have undermined Spaulding's credibility with the Jury. Additionally, the treating surgeon testified in deposition that he was not aware that Spaulding had been in an additional accident prior to Spaulding's appointment, a fact relevant to diagnosis. This fact had the potential to affect the Jury's assessment of Spaulding's claims, as well as the Jury's appraisal of the validity of the expert's opinions.
>
> The evidence presented at trial also established that the MRI revealed not only a torn rotator cuff, but also "moderate acromioclavicular osteoarthrosis with ganglion cyst formation." The treating surgeon indicated that the clavicle was "markedly arthritic," and stated in his deposition, that in addition to the rotator cuff repair, he removed about 7 to 8 millimeters of bone to correct the arthrosis related problems. The surgeon stated that the arthritic changes, including the ganglion cyst developed prior to the accident, and that the ganglion cyst in particular was a sign of a "more chronic, degenerative process." Given this evidence, the Jury could have concluded that Spaulding's issues were attributable to chronic, degenerative processes, and not due to the accident. Finally, as definitive diagnosis of the muscle tear did not occur until after the second accident had already occurred, the Jury could have concluded that Spaulding had not proven, more likely than not, that these injuries occurred in the first Accident.

*CONCLUSION*

> The Court concludes that the Jury's verdict of zero dollars was within the bounds of the evidence, and that there is no "clear indicat[ion] that the jury was motivated by prejudice, passion, partiality, corruption or that it considered an improper element." The Court, therefore, DENIES Plaintiff Joseph Spaulding's Motion to Correct Error.

Appellant's App. Vol. 2 at 18-19. This appeal ensued.

# Discussion and Decision

[16] Spaulding appeals from the trial court's denial of his motion to correct error. We review the grant or denial of a Trial Rule 59 motion to correct error under an abuse of discretion standard. *Speedway SuperAmerica, LLC v. Holmes*, 885 N.E.2d 1265, 1270 (Ind. 2008). On appeal, we will not find an abuse of discretion unless the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or is contrary to law. *Miller v. Moore*, 696 N.E.2d 888, 889 (Ind. Ct. App. 1998).

[17] Spaulding claims that the jury verdict is inadequate as a matter of law because the zero damages award is contrary to the evidence. As this court has observed,

> [a] jury determination of damages is entitled to great deference when challenged on appeal. *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001). The applicable standard of review has been summarized as follows:
>
> > Damages are particularly a jury determination. Appellate courts will not substitute their idea of a proper damage award for that of the jury. Instead,

the court will look only to the evidence and inferences therefrom which support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, *if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed*.

*Id.* (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994) (internal citations omitted)[, *trans. denied*]). In addition, [our] Supreme Court has noted the following:

Our inability to actually look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence. We cannot invade the province of the jury to decide the facts and cannot reverse unless the verdict is clearly erroneous.

*Id.* (quoting *Annee v. State*, 256 Ind. 686, 690, 271 N.E.2d 711, 713 (1971)).

*Flores v. Gutierrez*, 951 N.E.2d 632, 636 (Ind. Ct. App. 2011) (emphasis added), *trans. denied*.

[18] Still, it is well settled that "Indiana subscribes to the general principle of tort law that all damages directly attributable to the wrong done are recoverable." *Russell v. Neumann-Steadman*, 759 N.E.2d 234, 237 (Ind. Ct. App. 2001). A plaintiff has the burden to prove by a preponderance of the evidence that the medical expenses that he incurred were a proximate result of the defendant's negligence. *See Matovich v. Rodgers*, 784 N.E.2d 954, 958 (Ind. Ct. App. 2003).

Once that burden is met, "the law allows an injured plaintiff to recover the reasonable cost of necessary medical expenses." *Russell*, 759 N.E.2d at 237. The jury is not bound to award a plaintiff the exact amount of his medical expenses, but it may determine what amount is reasonable in light of the evidence.[1] *See Dee v. Becker*, 636 N.E.2d 176, 181 (Ind. Ct. App. 1994).

[19] Here, Spaulding contends that there is no evidence to support the jury's verdict. In particular, Spaulding points out that both Dr. Patel and Dr. Pritchard testified that his left shoulder injuries were caused by the June 8 accident. And Spaulding asserts that, because "[c]ausation is a complicated medical question that requires the testimony of expert medical witnesses[,]" and Cook did not present contrary medical witness testimony, the jury was required to believe Dr. Patel and Dr. Pritchard and award damages for Spaulding's injuries. Reply Br. at 5. We cannot agree.

[20] In *Walker v. Cuppett*, 808 N.E.2d 85, 95 (Ind. 2004), our Supreme Court stated,

> [d]octors and other expert witnesses are not oracles whose opinions, once stated, cannot be questioned or refuted *by other evidence*, even if that evidence does not come in the form of another expert's testimony. It is clear, for example, that a jury may reject unanimous medical expert testimony that a criminal defendant was legally insane at the time he or she committed a crime *where there is evidence that tends to undermine such testimony*.

---

[1] The actual amount charged to the plaintiff or the amount actually paid by him may tend to prove the reasonable and fair value of the services rendered to him but are not conclusive on the issue. *Chemco Transp., Inc. v. Conn*, 506 N.E.2d 1111, 1115 (Ind. Ct. App. 1987) (quoting *Herrick v. Sayler*, 160 F. Supp. 25, 29 (N.D. Ind. 1958)), *rev'd on other grounds*, 527 N.E.2d 179 (Ind. 1988).

*See Cate v. State*, 644 N.E.2d 546, 547-48 (Ind. 1994) (holding jury was free to reject unanimous opinion of five psychiatrists that defendant was legally insane where psychiatrists' assertions were not uncontroverted by other evidence). The law in Indiana is that "[e]xpert opinion regarding causation may be admissible and yet in conjunction with other evidence may be either sufficient or insufficient to support a verdict." *Strong v. State*, 538 N.E.2d 924, 930 (Ind. 1989). "[A]s is virtually the unanimous rule in this nation's jurisdictions, the jury is free either to accept or reject the opinion of the expert witness; the finder of fact may supplant its own conclusion for that of the expert." *Id.* at 931 (quoting *Noblesville Casting Div. of TRW v. Prince*, 438 N.E.2d 722, 729 (Ind. 1982)). This rule would seem to have little meaning if . . . a defendant cannot challenge or cast doubt upon the opinion of a plaintiff's expert that the plaintiff was injured by the defendant with *evidence that the plaintiff suffers from a pain-producing disease or mechanism, unrelated to the defendant's negligence, in the precise area of the body where the plaintiff claims to suffer ongoing pain.*

(Emphases added). And in *Flores*, this court stated as follows:

It is true that "[t]he testimony of a trained physician who has examined and treated a patient concerning matters purely within the medical realm cannot be controverted by lay opinion or by judicial speculation or inference." *Beaman v. Hedrick*, 146 Ind. App. 404, 407, 255 N.E.2d 828, 830 (1970) (reversing trial court determination of paternity when expert medical witness's testimony was that paternity was improbable but not impossible). "However, *on medical matters which are within the common experience, observation, or knowledge of laymen, no expert testimony is required to permit a conclusion on causation.*" *Willis v. Westerfield*, 839 N.E.2d 1179, 1188 (Ind. 2006) (internal quotation omitted).

951 N.E.2d at 636-37 (emphasis added).

Thus, here, we must determine whether there is any evidence to undermine the medical expert testimony that Cook proximately caused Spaulding's injuries. And we must determine whether the proximate cause of Spaulding's injuries concerns "matters purely within the medical realm" or whether it is "within the common experience, observation, or knowledge of laymen." *Id.*

We agree with Cook that our opinion in *Flores* is on all fours with the instant case. In *Flores*, the plaintiff alleged that he had neck and back pain caused by the defendant's negligence in rear-ending his vehicle in 2007. But the plaintiff had a history of pre-existing conditions preceding the accident with the defendant, and the plaintiff's credibility was called into doubt. In particular:

> Flores had multiple back problems, including a history of back and neck pain, much of it pre-existing what was from all appearances a relatively minor accident. An MRI report specifically attributed his muscle spasm condition to these pre-existing conditions, not to the accident as Dr. Jones did. Flores did not seek medical attention for his injury from his diagnosing physician during an almost two-year gap between his initial visits and the instant diagnosis. In addition, he sustained a fall during this time period which he did not divulge to Dr. Jones and which Dr. Jones did not consider when reaching his diagnosis. As Dr. Jones testified, such a fall would have been relevant to the diagnosis.

*Flores*, 951 N.E.2d at 637. The jury awarded Flores zero damages, and we held that, "[t]he simple facts that Flores had multiple pre-existing back problems with multiple causes and that Dr. Jones's diagnosis was attributable to an incomplete record and a patient with credibility problems places it outside the

'purely medical realm' requiring expert testimony to controvert it." *Id.* Thus, we affirmed the jury's verdict.

[23] Here, the undisputed evidence shows that, at the time of the June 8 accident, Spaulding had pre-existing conditions in his left shoulder, namely, arthritis and a ganglion cyst. Dr. Pritchard explained that the MRI of Spaulding's left shoulder showed moderate and chronic degenerative arthritis and a ganglion cyst that pre-dated the June 8 accident, and he testified that a cyst is the result of "two rough surfaces" rubbing together "[a]s an irritation" and producing fluid. Plaintiff's Ex. 35 at 39. In addition, Spaulding did not seek medical attention until the day after the accident, which was, according to Cook's testimony, not "very serious[.]" Plaintiff's Ex. 31 at 30. Indeed, there was no damage to Cook's van other than the rusted-out bumper coming loose, and the damage to Spaulding's car was minor. Moreover, Spaulding was not forthright with Dr. Pritchard in that, during his initial appointment with Dr. Pritchard on August 3, 2012, Spaulding told him about the June 8 accident but did not tell him about the July 27 accident. And Dr. Pritchard testified that his opinion on causation was "based upon the history that[ was] provided" to him. Plaintiff's Ex. 35 at 43.

[24] We also note that Spaulding testified that he had been involved in approximately three other vehicular accidents prior to the June 8, 2012, accident with Cook. On one occasion, Spaulding was driving on I-69 when a tire blew out on his vehicle, which "tore up the fender and the door" of his car. Defendant's Ex. F at 29. That evidence of prior accidents, combined with Dr.

Pritchard's testimony that a rotator cuff tear can occur just by "holding on very firmly" to a steering wheel, could have led the jury to reasonably infer that Spaulding had injured his left shoulder prior to the June 8 accident. Plaintiff's Ex. 35 at 43.

[25] Finally, Dr. Pritchard testified that, "to the best of [his] knowledge," Spaulding's rotator cuff tear "more than likely occurred" as a result of the June 8 accident. *Id.* at 15, 42-43. But Dr. Pritchard could not establish the date of onset of Spaulding's injuries by diagnostic tests or during surgery. The jury was entitled to weigh the evidence and determine the credibility of Dr. Pritchard's opinion "based on the evidence presented and the degree of certitude with which the opinion [was] cast." *Glenn v. Bd. of Comm'rs, Harrison Cty., Ind.*, 552 N.E.2d 485, 487 (Ind. Ct. App. 1990). Because the nature of Spaulding's injuries was mostly subjective and Dr. Pritchard could not state with absolute certainty that the accident had caused them, the jury, in its discretion, could have disregarded Dr. Pritchard's conclusions on causation.

[26] We hold that, in light of Spaulding's pre-existing conditions in his left shoulder, his failure to inform Dr. Pritchard of the July 27 accident during the consultation one week after that accident, the degree of certitude underlying Dr. Pritchard's opinion, and the relatively minor impact in the June 8 accident, the issue of causation is "outside the 'purely medical realm' requiring expert testimony to controvert it." *Flores*, 951 N.E.2d at 637; *see also Conklin v. Demastus*, 574 N.E.2d 935, 940 (Ind. Ct. App. 1991) (affirming jury verdict for defendant, despite his concession of negligence, in light of plaintiff's medical

history, plaintiff's credibility issues, minor damage to cars, and no injuries reported at the scene). Thus, the jury's determination that Spaulding was entitled to zero damages arising out of his accident with Cook is not outside the bounds of the evidence. *Id.* The trial court did not abuse its discretion when it denied Spaulding's motion to correct error.

Affirmed.

Mathias, J., and Barnes, J., concur.