**SEARS ROEBUCK AND CO., Defendant/Appellant, Respondent to Transfer,**

v.

**Milan MANUILOV, Plaintiff/Appellee, Petitioner on Transfer.**

No. 73S01–0002–CV–119.

Supreme Court of Indiana.

Jan. 23, 2001.

Donald D. Levenhagen, Hill Fulwider McDowell Funk & Matthews, Indianapolis, Indiana, Attorneys for Appellant.

W. Scott Montross, John F. Townsend, III, Townsend & Montross, Indianapolis, Indiana, Attorneys for Appellee.

Ind. Trial Lawyers Assoc., Theodore F. Smith Jr., Anderson, Indiana, Product Liability Advisory Council, Inc., Chilton Davis Varner, Amy M. Power, King & Spalding, Atlanta, Georgia; Hugh F. Young, Jr., Reston, Virginia; Albert J. Dahm, James J. Ammeen, Jr., Baker & Daniels, Indianapolis, Indiana, Amicus Curiae.

**On Petition to Transfer**

DICKSON, Justice

The defendant-appellant, Sears Roebuck and Co., appeals following a jury trial and judgment awarding compensatory damages of $1,400,000 to the plaintiff-appellee, Milan Manuilov, a 34–year old circus high-wire performer who was injured in 1988 while shopping at the defendant's retail store. The Court of Appeals reversed and remanded for a new trial. *Sears Roebuck and Co. v. Manuilov*, 715 N.E.2d 968 (Ind. Ct.App.1999). We granted the plaintiff's petition for transfer, thereby vacating the decision of the Court of Appeals. The issues presented in the defendant's appeal are now before us, pursuant to Indiana Appellate Rule 11(B)(3). The defendant asserts that the trial court erred as to (1) the exclusion of evidence; (2) the admission of medical testimony; and (3) the award of substantial damages. We affirm the judgment of the trial court.

**Exclusion of Evidence**

■ The defendant first contends that the trial court improperly excluded evidence of the plaintiff's prior domestic violence, criminal history, and untruthfulness. Specifically, the defendant argues that the trial court erroneously precluded it from calling the plaintiff and his girlfriend to testify on these matters.

The portion of the record submitted on appeal indicates that, at the conclusion of the plaintiff's case-in-chief but before the defendant began presentation of its evidence, the trial court conducted a conference with counsel outside the presence of the jury. Asserting that defense counsel, contrary to alleged representations the prior day, intended to call the plaintiff and his friend, Helen Kurihara, as witnesses, the plaintiff's counsel requested an in-camera session to determine what the defense

intends to ask "because it may be extremely prejudicial in front of this jury." Record at 761. Counsel for the plaintiff expressed concern about the potential for a mistrial.[1] The defense responded that it would not reveal the intended questions and asserted that the plaintiff was not entitled to an order in limine to pre-screen its questions. The trial court, after instructing the plaintiff and a lady seated in the back of the courtroom to leave the courtroom, invited further explanations from counsel.

The defendant's counsel noted that Dr. Martin Blinder, a psychiatrist who had testified regarding the plaintiff's post-concussion syndrome, had testified that the plaintiff was not a malingerer based in part upon information provided by the plaintiff. Defense counsel observed that Dr. Blinder noted that there were about thirty different possible factors and argued that the plaintiff failed to disclose to his doctor "one of these factors that go to the malingering opinion." *Id.* at 765–66. When directed by the trial court to identify the factor, defense counsel at first refused to comply except to name three possibilities: the plaintiff's work record, his school discipline record, and his doing "unsavory" things.[2] After further encouragement from Judge O'Connor, defense counsel handed the judge, but not opposing counsel, a fax document that defense counsel said he received the previous night and which purportedly identified the matter sought to be raised by the defense.

Plaintiff's counsel responded that, from the attendant secrecy and surrounding circumstances, the nature of the inquiry is likely to be an evidentiary harpoon that should be disclosed and subjected to any objections for resolution out of the presence of the jury. The court stated:

---

1. This was the second jury trial in this case. In the first trial, held in Wayne Superior Court, the jury was unable to reach a unanimous verdict. The case was then venued to Shelby Circuit Court.

2. Dr. Blinder in discussing the various factors included "unsavory things" and gave as examples wife beating, drug abuse, minor arrest records, and failure to pay bills.

I guess maybe you better first make an offer to prove. That's the only way that I know to go about it because the nature of the evidence is such that ... it could certainly be highly prejudicial and inflammatory and that might, in and of itself, outweigh any benefit to the jury to determine any of the issues....

*Id.* at 769. After further resistance from defense counsel, the court added: "under the circumstances that at least an offer to prove outside the presence of the jury is appropriate so that I can determine, or at least try to determine, whether or not the prejudice outweighs the relevance and ... the assistance to the jury to determine any fact [in] issue." *Id.* at 770–71.

With the jury still out of the courtroom, the defense then called the plaintiff to the stand and asked several questions about an alleged previous incident of violence against the plaintiff's girlfriend. Noting that the defense appeared to be reading from official documents, plaintiff's counsel offered to shorten the inquiry by stipulating the documents for the purpose of the defendant's offer to prove. The defendant's counsel and the trial court agreed, and Defendant's Exhibit I was admitted for this limited purpose.

The seven page exhibit consisted of: (a) an Application for Temporary Protective Order alleging that the plaintiff had threatened and committed acts of violence against Helen Kurihara in Nevada two years earlier; (b) the Court Master's recommendation that the order be granted; (c) the Clark County Nevada District Court's Temporary Protective Order Against Domestic Violence; (d) proof of service; and (e) minutes of the resulting court hearing in which both parties testified and, upon the applicant's request, the protective order was dissolved.

Following further arguments from both counsel, Judge O'Connor prohibited the defense from presenting the information to the jury, explaining his reasoning as follows:

Obviously, one of the things that bothers me in this case, and I mentioned it yesterday, or when I addressed certain conduct in the courtroom, that I was asked, essentially by counsel, that this case be put on the fast track because it had been tried before, everyone agreed to the deadlines with respect to certain cut-off dates, the trial date was set and seemed as if everybody wanted to go forward and I guess the principle that I've adhered to over the last fifteen years is that everybody comes into this Courtroom on the same playing field and we don't try cases by ambush or by surprise. And, of course, I don't know whether this knowledge was known, this information was made known to plaintiff or not. Obviously, the discovery cut-off date is long since past and, you know, we're into the fourth full day of what I thought would be a 4–day trial and now who knows where we're going. Obviously, I'm concerned, certainly the plaintiff's credibility is an issue at this point because of the information that was divulged. The timing of the divulging of the information really strikes me as being interesting, but I don't have any control over that except through my deadlines and cut-off dates. The prejudicial impact of the jury receiving this information, regardless of what kind of limiting instructions the court gave or cautioned or so forth, would far outweigh, in my opinion, the probative value. Of course, on the other hand, we don't know what Dr. Blinder's response would be to how this information would affect his opinion about the plaintiff. So I'm really caught in a dilemma. I don't want to lose this case. One option I have, obviously, is at this point to declare a mistrial and have you people start all over again. If I did that, it would be with somebody else I can assure you, it wouldn't be with me, but I'm not sure that that's an approach I want to take at this point either.... Keeping all those factors in mind and understanding the pros and cons and the

plusses and minuses and the prejudice to both sides, the time of day and where we are, and in view of how the information appeared into the ... fourth full day of trial, with very little opportunity for there to be any investigation, other than what occurred in the courtroom by the opposing party, it's my determination that, and I think the offer to prove is sufficient for the record, that this information will not go to the jury.

*Id.* at 796–98.

Indiana Evidence Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Trial courts are given wide latitude in making the evaluation required under Rule 403, and appellate reversal is appropriate only for abuse of discretion. *Ingram v. State,* 715 N.E.2d 405, 408 (Ind.1999); *Tompkins v. State,* 669 N.E.2d 394, 398 (Ind.1996). The trial court's ruling is presumptively correct, and a challenger bears the burden on appeal of persuading us that the court erred in its exercise of discretion. *Anderson v. State,* 681 N.E.2d 703, 706 (Ind.1997).

Urging that the excluded evidence was highly relevant and probative upon the issue of malingering, the defendant cites *Barnes v. Barnes,* 603 N.E.2d 1337, 1342 (Ind.1992), and *City of Indianapolis v. Swanson,* 448 N.E.2d 668, 671–72 (Ind. 1983), to support his demand for a new trial. The defendant argues that a trial court may only balance marginal evidence against prejudicial evidence and that it "has no discretion to exclude evidence that is better than marginal." Reply Brief of Appellant at 4.

Our opinion in *Barnes* held that the Indiana Rape Shield Statute does not apply in civil cases to exclude evidence of a plaintiff's prior sexual activities. We expressly noted that a trial court's latitude to exclude prejudicial evidence was limited:

"relevant evidence—that which logically tends to prove a material fact—is not inadmissible simply because of its prejudicial impact." 603 N.E.2d at 1343. In *Swanson,* noting that "a trial court may not properly deny the cross-examination of a party concerning facts connected with that party's own acts and statements relating to the case which tend to impair that party's credibility," we found that the trial court erred in excluding prejudicial evidence. 448 N.E.2d at 671–72. Both these decisions preceded the adoption of the Indiana Rules of Evidence in 1994 and this Court's specific adoption of Rule 403's federal counterpart in *Hardin v. State,* 611 N.E.2d 123, 128–29 (1993). Contrary to the limitations applied in *Barnes* and *Swanson,* the rule expressly authorizes trial courts to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. The rule does not limit exclusion only to marginally probative evidence.

The defendant emphatically argues that the excluded evidence was highly relevant and urges that its exclusion precluded the defense from an opportunity to expose the plaintiff "as precisely the type of lying, unsavory character" that would establish him as a malingerer under the criteria used by Dr. Blinder. Brief of Appellant at 19.

Considering the circumstances presented, the presumptive correctness of the trial court's ruling, and its thoughtful evaluation, we decline to find an abuse of discretion in excluding the evidence.

### Medical Testimony

The defendant contends that the trial court erred in admitting medical testimony concerning the cause of plaintiff's injuries and his capacity to return to work. We discern its appellate claim to be that Indiana Evidence Rules 403 and 702(a) and (b) were violated by the admission of medical testimony that the plaintiff's fall caused him to suffer from post-concussion syn-

drome that prevented him from returning to work as a circus high-wire performer.[3]

The plaintiff called two medical experts. Jeffrey Quillen, M.D., a physician with the emergency department at Reid Memorial Hospital in Richmond, Indiana, initially examined and treated the plaintiff when he was brought to the emergency room by ambulance immediately after his fall. Dr. Quillen testified that he diagnosed the plaintiff's injury as "post-concussion dizziness," Record at 514, that the plaintiff "has symptoms related to post-concussive syndrome," *id.* at 519, "that he suffers from post-concussive syndrome," *id.* at 531, and that the reason for the plaintiff's persistent symptoms "stems from the original fall and injury to his head for which I saw him for the first time," *id.* at 531, 532.

Psychiatrist Martin Blinder, M.D., examined the plaintiff in 1991 and 1995. After describing his medical and specialty education and training, experience, teaching, research, and writing, Dr. Blinder provided an extensive explanation of post-concussion syndrome and then detailed his psychiatric examination and assessment of the plaintiff. He determined that the plaintiff suffers from post-concussion syndrome, *id.* at 608, which is "causally related" to his fall on January 27, 1988. *Id.* at 628. Asked whether brain damage associated with post-concussion syndrome exists as a result of the plaintiff's fall, Dr. Blinder answered:

> I cannot prove the extent to which [the plaintiff] currently suffers brain damage. This reflects less in my inadequacy tha[n] the state of the field at this time at the end of the 20th century. Secondly, though I think there are clinical indices for concussion, which is listed under

physical injuries, there's no way I can tell you how much of all the symptoms are attributable to the concussion, as opposed to psychological factors. But there is an amalgam here of physical and psychological and I can't draw a bright line between them. They're interwoven and . . . I cannot do that. So I cannot apportion between the physical and the psychological. Finally, though, I know a thing or two about the affects [sic] of head injury on patients in terms of their ability to function mentally, physically, psychologically, emotionally, sexually. . . . There's no doubt that I would defer to somebody who had even greater expertise than I do. . . . I do not have a monopoly on truth when it comes to assessing brain damage. With those qualifications, it is my opinion, to a reasonable degree of medical probability, based on the available evidence for all of its limitations, that this man took a hell of a hit to the head. That this hit to the head has disabled him for reasons that are combined, both physical and psychological factors. Uh, that there is some room for improvement down the road, uh, but that he will have a substantial disability, and that disability impacts upon his personal life and upon his capacity to return to his previous profession.

*Id.* at 711–12. Dr. Blinder also stated that, "this amalgam of psychiatric and post-concussive syndrome symptoms would nonetheless, to a reasonably medical probability, allow [the plaintiff] to safely negotiate one end of the high-wire to the other, anywhere from ninety-six to ninety-seven percent of the time." *Id.* at 627–28.

---

3. In the argument section of his brief, the defendant does not identify the specific testimony alleged to have been erroneously admitted. Indiana Appellate Rule 8.3(A)(7) requires, among other things, that each error "be set forth specifically" and that the argument contain the contentions, reasons in support, and citations to "the parts of the record relied upon." The revised Rules of Appellate Procedure that are effective on January 1, 2001, have analogous specific requirements. Rev.App. R. 46. Full and careful compliance with the rule enables the reviewing Court to address the claims asserted. In the present case, by analyzing the Statement of Facts section of the defendant's brief, we have been able to discover the specific errors claimed and the applicable parts of the Record. This unconventional presentation has made our review challenging.

The defendant contends that the admission of opinions by Dr. Quillen and Dr. Blinder that the plaintiff's fall caused post-concussion syndrome that disabled him from returning to his work violate Indiana Evidence Rule 702. The rule is titled "Testimony by Experts" and provides:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Evid. R. 702. The trial court's determination regarding the admissibility of expert testimony under Rule 702 is a matter within its broad discretion, and will be reversed only for abuse of that discretion. *Cook v. State*, 734 N.E.2d 563, 570 (Ind. 2000); *McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind.1997). The defendant claims that Dr. Quillen's causation testimony is not scientifically reliable, contrary to Rule 702(b), because the doctor last examined the plaintiff almost ten years before the trial. The defendant further argues that the testimony of both Dr. Quillen and Dr. Blinder regarding post-concussion syndrome did not assist the jury, contrary to Rule 702(a), because "[p]roof of a syndrome does not mean that the symptom etiology is known; instead it merely means that the subject has symptoms which fit a recognized pattern of symptoms in subjects with a history of head injury." Brief of Appellant at 22–23. In addition, the defendant contends that Dr. Blinder's causation opinions were scientifically insufficient under Rule 702(b) because as a psychiatrist, he is not qualified to diagnose subtle brain damage; because possible organic causes were not within his area of expertise; and because he did not rule out physical causes. Also asserting that Dr. Blinder was not qualified to render a vocation opinion, the defendant further claims that it was error to admit his testimony concerning the percentage of times the plaintiff would be able to safely cross the high-wire and his opinion that the plaintiff suffered an impact upon his capacity to return to his work as a high-wire circus performer.

The defendant's objections to the physicians' testimony that the plaintiff suffers from post-concussion syndrome were extensively presented both at trial and before trial. The defendant's pre-trial motion in limine sought to exclude all evidence that the plaintiff was diagnosed as suffering from post-concussion syndrome. At the hearing of this motion, the parties submitted extensive briefing and materials, including Dr. Blinder's deposition and testimony of Dr. Quillen and Dr. Blinder during the inconclusive first trial, in which both physicians explained the basis for their diagnosis and were zealously cross-examined by the defense. Dr. Blinder's testimony included the following:

The post-concussion syndrome refers to injury to the brain that, first of all, is diffuse. Rather than say a bullet or a localized bruising on the surface of the brain, the impact is spread out fairly evenly throughout all the brain cells so that perhaps there is [sic] thousands of little, undetectable twistings or turnings or damage to the neurons of the brain that may cause a variety of symptoms ranging from dizziness and headache, a cognitive slowing, that is slowing down of the ability to remember, to learn new information, to give it back, personality changes, depression and anxiety. And if you're lucky, these symptoms as to the concussion fade away after several months. There is a certain group of people, however, for whom these symptoms appear to be permanent. That is they spend the rest of their lives with just some subliminal—some subtle dizzi-

ness, heightened levels of tension and anxiety, a melancholy that they can't seem to shake even on the sunniest of days and a sense that their mental functions just aren't as quick as they once were and even though nothing shows up on x-rays and on the standard tests, these people, for the rest of their lives, operate at a somewhat reduced level of function. So that is a typical post-concussion syndrome.

Record at 83–85. The doctor had also stated: "for the most part, the diagnosis [of post-concussion syndrome] is made by the complaints of the patient, falling into a well-described, circumscribed and precise pattern." *Id.* at 89.

Notwithstanding the defendant's vigorous challenge to the basis and accuracy of the physicians' diagnosis, the trial court denied the motion in limine.

At trial, the court received further information relating to the scientific principles for the challenged testimony when Dr. Blinder explained:

In real life, at our conclusions, which we call diagnoses, by attempting to establish whether or not a patient's complaints fall into an established constellation, a familiar pattern, and I spoke earlier of the pattern of symptoms that means heart attack or concussion, because these conclusions are being made in a clinic, on a clinical basis, as opposed to being made in a laboratory, or as opposed to being subject to the kinds of scientific studies that you might use to, uh, measure the speed of light, or the speed of a particular chemical equation, uh, they are called clinical conclusions to distinguish them from perhaps legal conclusions or other kinds of logical conclusions. They are based upon clinical observations made by many, many people, many other physicians over a long period of time. The patterns are estab-

lished and the textbooks, we're taught these patterns in medical school, and we're trained to recognize and search them out, and recognize them when we encounter our patients in the clinic.

*Id.* at 592–93. In contrast, the defendant did not present any evidence at trial or during the motions in limine proceedings to establish that the post-concussion syndrome diagnosis of Dr. Quillen and Dr. Blinder was *not* based on reliable scientific principles.

In adopting Evidence Rule 702, this Court did not intend to interpose an unnecessarily burdensome procedure or methodology for trial courts. By requiring trial courts to be satisfied that expert opinions will assist the fact-finder and that the underlying scientific principles are reliable, Rule 702 guides the admission of expert scientific testimony. Although it authorizes the exclusion of purported scientific evidence when the trial court finds that it is based on unreliable principles, the adoption of Rule 702 reflected an intent to liberalize, rather than to constrict, the admission of reliable scientific evidence. Before Rule 702(b), Indiana courts applied the *Frye*[4] test which determined the admissibility of novel scientific evidence based upon its general acceptance in the scientific community. *Hopkins v. State,* 579 N.E.2d 1297, 1301–04 (Ind.1991). Rule 702(b) is broader than the *Frye* test in that it permits trial courts to consider factors other than general acceptance and thus may permit expert testimony in new, innovative areas even though general acceptance may not yet have been achieved but which are otherwise found to be based on reliable scientific principles. This is analogous to the liberalizing of the *Frye* rule achieved by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113

---

**4.** *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923) (required that proponents of novel scientific evidence demonstrate that the scientific principle or technique upon which

the opinion testimony depended was "sufficiently established to have gained acceptance in the particular field in which it belongs.").

S.Ct. 2786, 125 L.Ed.2d 469 (1993).[5] *See McGrew,* 682 N.E.2d at 1291 n. 4. Given that the thrust of our Rule 702(b) was to liberalize admissibility of reliable scientific evidence, "it is most improbable that a generally accepted scientific principle would be too unreliable to be admitted into evidence." 13 Robert Lowell Miller, Jr., Indiana Evidence § 702.202 at 395 (1995).

If applied to separately evaluate every subsidiary point made during the testimony of a qualified expert regarding matters based on reliable science, Rule 702(b) can become excessively burdensome to the fair and efficient administration of justice. It directs the trial court to consider the underlying reliability of the general principles involved in the subject matter of the testimony, but it does not require the trial court to re-evaluate and micromanage each subsidiary element of an expert's testimony within the subject. Once the trial court is satisfied that the expert's testimony will assist the trier of fact and that the expert's general methodology is based on reliable scientific principles, then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact. *See Hottinger v. Trugreen Corp.,* 665 N.E.2d 593, 598 (Ind.Ct.App.1996).

As noted above, the admission of expert testimony challenged under Rule 702 is within the discretion of the trial court. The medical testimony was presented from clearly qualified expert witnesses as to matters that assisted the jury. The trial court did not abuse this discretion when it admitted the causation testimony of Dr. Quillen, the emergency room doctor who treated the plaintiff at the time of his injury but not in the intervening period of almost ten years to the time of trial. Nor did the court exceed its latitude when it

permitted Dr. Quillen and Dr. Blinder to testify regarding post-concussion syndrome after considering and rejecting the defendant's claim that it was not based on reliable scientific principles. The medical testimony explained the basis for this diagnosis. Notwithstanding robust cross-examination and argument of defense counsel, Judge O'Connor overruled defense counsel's objections. We decline to find as a matter of law that a medical diagnosis of post-concussion syndrome is scientifically unreliable. We further find that the trial court was not required to exclude Dr. Blinder's causation opinions in response to the defendant's claims that organic and physical brain damage were not directly within his area of expertise as a physician and psychiatrist. These are matters of weight and credibility and were vigorously raised for the jury's consideration, and they do not require us to find error in the admission of the evidence.

As to the defendant's claim that Dr. Blinder was not qualified to render a vocational opinion, the trial court did not err. The doctor's testimony that the severe blow to the head from the plaintiff's fall resulting in continuing dizziness and headaches and preventing him from returning to his career as high-wire performer is not a matter necessarily restricted to the province of a vocational expert knowledgeable about the requirements of circus high-wire artistry. That dizziness would substantially affect the plaintiff's capacity to perform on the high-wire is a matter of common sense, and does not require vocational expertise.

Mindful that the trial court's determination of admissibility under Rule 702 may be reversed only for abuse of discretion, we decline to find error on this issue.

The defendant also contends that the physicians' testimony regarding post-concussion syndrome should have been ex-

**5.** The defendant's argument is based in large part upon federal decisions applying *Daubert.* While potentially helpful, federal jurisprudence interpreting *Daubert* is not binding on

Indiana courts in deciding evidentiary issues. *See McGrew,* 682 N.E.2d at 1290; *Steward v. State,* 652 N.E.2d 490, 498 (Ind.1995).

cluded under Ind. Evid. Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice, particularly its potential to confuse and mislead the jury. As discussed *supra,* we afford trial courts wide latitude in making the evaluation required under Rule 403, we presume the court's ruling to be correct, a challenger bears the burden on appeal of persuading us that the court erred in its exercise of discretion, and its ruling will be overturned only for abuse of discretion. The trial court did not abuse its discretion in admitting the evidence over the defendant's objections based on Rule 403.

### Damages

■ The defendant contends that the award of $1,400,000 in compensatory damages is not supported by the evidence. He argues that there was insufficient evidence that the plaintiff's medical expenses were necessary and related to the accident, that his earning capacity was impaired, that his future pecuniary loss was established, and that ongoing symptoms and disability were caused by his fall at the defendant's store.

■ A jury determination of damages is entitled to great deference when challenged on appeal. The applicable standard of review was discussed and summarized by the Court of Appeals in *Prange v. Martin,* 629 N.E.2d 915, 922 (Ind.Ct.App. 1994), *trans. denied.*

> Damages are particularly a jury determination. Appellate courts will not substitute their idea of a proper damage award for that of the jury. Instead, the court will look only to the evidence and inferences therefrom which support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed.

*Id.* (citations omitted). Similarly, this Court has noted:

> Our inability to actually look into the minds of the jurors is, to a large extent, the reason behind the rule that we will not reverse if the award falls within the bounds of the evidence. We cannot invade the province of the jury to decide the facts and cannot reverse unless the verdict is clearly erroneous.

*Annee v. State,* 256 Ind. 686, 690, 271 N.E.2d 711, 713 (1971).

The evidence favorable to the award of damages includes the medical testimony that the plaintiff's fall at the defendant's store caused serious and longstanding physical and mental injuries, particularly dizziness and headaches. An exhibit was admitted listing the plaintiff's incurred medical expenses of $10,147.13, to which there was no trial objection. At the time of the accident, the plaintiff was a 34–year old internationally recognized circus high-wire artist. For several years, he had worked for the Ringling Brothers Circus. He performed for Presidents Nixon, Carter, Ford, and Reagan. The plaintiff's principal circus agent provided various details regarding the plaintiff's impaired earnings. The agent, a former flying trapeze artist for twenty-five years, had extensive experience booking circus performers and had forty years experience in observing high-wire acts. The plaintiff's act had been booked for $800 per day in the past, and there were sufficient opportunities available for these engagements about 300 days a year. Just before the plaintiff was injured, the agent had arranged an opportunity for him to work at Circus Circus in Las Vegas for $2000 per week for fifty-two weeks per year. The agent also testified regarding the expenses associated with the plaintiff's high-wire act. The plaintiff intended to continue working his profession as a high-wire performer until in his sixties, which was not unusual for similar performers, according to the agent. In addition to the plaintiff's pain and suffering from the continuing symptoms of post-concussion syndrome, his persistent dizziness and resulting fear

of falling reasonably prevented him from resuming his profession as a circus high-wire performer and had already resulted in substantial loss of income during the almost ten years between the accident and the trial and will continue into the future.

We find that there was evidence to support the jury's determination of damages. We decline to find that the verdict was clearly erroneous.

The judgment of the trial court is affirmed.

RUCKER, J., concurs.

SULLIVAN, J., concurs except as to the section captioned "Medical Testimony" as to which he concurs in result.

BOEHM, J., dissents with separate opinion in which SHEPARD, C.J. concurs.

BOEHM, Justice, dissenting.

I respectfully dissent because, in my view, the first and second issues addressed by the majority are not independent of each other, and, in concert, produce a flawed trial. Dr. Blinder testified, among other things, that in his opinion Manuilov was not a malingerer. This opinion was not based on observation of physical symptoms or scientifically valid tests, but on Blinder's observation of Manuilov's behavior and accounts of that behavior furnished by Manuilov or his counsel. Among the latter was the assurance that Manuilov had no criminal history or anti-social behavior.

Blinder told the jury that Manuilov had no criminal history and suggested he was not a "wife beater." These assumptions were explicitly made a basis of his view that Manuilov was not a malingerer. This was not challenged under Indiana Evidence Rule 704(b), which provides that a witness may not testify as to whether another "witness has testified truthfully," so, to the extent this is an issue, it is not presented here. However, when the defense sought to prove that the information on which Blinder based his views was false, the trial court excluded that evidence

because of the obvious prejudice that would result from evidence that Manuilov was allegedly involved in domestic violence. An offer of proof established that the defense was prepared to offer evidence that Manuilov had been charged with domestic violence on at least two occasions, and had been found in contempt of a restraining order.

The balance under Indiana Evidence Rule 403 between probative value and prejudice is a matter of trial court discretion and this ruling was made under difficult circumstances by an experienced and highly respected trial judge. Certainly in normal circumstances that balance would preclude evidence of domestic violence or a minor criminal record even if marginally relevant. Here, however, the evidence was offered to rebut factually incorrect testimony that Manuilov had purposefully elicited to bolster his claim. In my view, Manuilov opened the door as wide as it can get. It is simply unfair to permit a party to open up the subject of his own truthfulness, put on an expert to bolster it based on false factual assumptions, and then successfully oppose evidence that undercuts those assumptions under a claim of prejudice. I believe the Court of Appeals majority was correct in ordering a new trial.

SHEPARD, C.J., concurs.