

FILED

Oct 26 2018, 9:06 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

William H. Kelley
Thaddeus C. Kelley
KELLEY LAW OFFICES LLC
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Ann Marie Waldron
WALDRON LAW
Indianapolis, Indiana

Michael E. Simmons
HUME SMITH GEDDES GREEN &
SIMMONS, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nolan Clayton,<br>*Appellant-Defendant,*<br><br>v.<br><br>Gregory Smith,<br>*Appellee-Plaintiff.* | October 26, 2018<br><br>Court of Appeals Case No.<br>18A-CT-705<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable James B. Osborn,<br>Judge<br><br>Trial Court Cause No.<br>49D14-1606-CT-21431 |

**Bailey, Judge.**

# Case Summary

Upon the trial of a personal injury action brought by Gregory Smith ("Smith") against Nolan Clayton ("Clayton"), a jury found Clayton liable for $21,000,000.00, and the trial court subsequently awarded Smith a portion of the prejudgment interest he requested. Clayton moved for post-verdict credit for advance payments purportedly made by insurers on his behalf, but the trial court did not contemporaneously reduce the verdict.[1] Clayton appeals, asking that we set aside the judgment entered upon the jury verdict and remand for a new trial. We affirm.

# Issues

Clayton presents four issues for review:

    I.     Whether the trial court abused its discretion in making evidentiary rulings pertaining to prior conduct of Clayton and Smith;

    II.     Whether the trial court abused its discretion in admitting testimony from Smith's three expert or skilled witnesses;

    III.     Whether Smith was improperly awarded prejudgment interest; and

---

[1] A declaratory judgment action involving one or more of the insurers was pending in another court.

> IV. Whether Clayton is entitled to post-verdict credit for advance payments.

# Facts and Procedural History

Smith and Clayton met as Stacked Pickle co-workers and became friends who socialized a few times per week, typically going to a gym to work out or to bars to drink and watch televised sports. As of February 2016, Smith was the manager of a Stacked Pickle bar in Fishers. He volunteered to work a few hours on the evening of February 17, 2016 at a special event at the Stacked Pickle near downtown Indianapolis. Smith asked Clayton to accompany him and wait while Smith worked.

Smith drove his truck to the Indianapolis Stacked Pickle, with Clayton as his passenger. At that time, it was anticipated that Smith would be driving himself and Clayton home. Smith began his work and Clayton sat down at a bar table. Clayton ordered his first alcoholic drink around 10:30 p.m. About one hour later, Smith was told that there were sufficient employees to cover the special event without him. Smith sat down at Clayton's table and began to consume alcoholic drinks also.

After several hours of drinking, Smith and Clayton apparently realized that they should not drive. They had some discussion about calling a ride-sharing service, but Clayton was unable to get his telephone application to work. Ultimately, a Stacked Pickle employee asked that Smith leave. He and Clayton complied with the request, but both were unable to walk steadily. On the way

out, the pair crashed into a hostess stand and broke it. A Stacked Pickle employee locked the door and called for a cab to pick up the men outside.

[6] Smith and Clayton began to bang on the glass and yell that a coat had been left behind. Someone handed a coat out to Smith or Clayton and they moved away from the door. Thereafter, some Stacked Pickle patrons or employees saw Smith and Clayton wrestling around on the pavement, but their words were not audible inside the building. As the summoned cab arrived, Smith's truck passed the cab and headed north. Clayton was the driver and Smith was the passenger. Neither would later remember how Clayton obtained the truck keys or what discussion preceded Clayton taking the wheel.

[7] Minutes later, at around 3:52 a.m. on February 18, Smith's truck crashed into a tree near 10th Street and White River Parkway. Clayton was not seriously injured. However, Smith was ejected from the truck and suffered a broken neck. He was rendered quadriplegic, deprived of sensation below his neck and lacking control of his extremities, other than some limited bicep function. Blood tests revealed that, at 4:52 a.m., Smith's blood alcohol content was 0.245 and, at 6:20 a.m., Clayton's blood alcohol content was 0.208. Clayton was arrested and ultimately pleaded guilty to driving while intoxicated.

[8] Smith had liability coverage through a policy issued by Progressive Southeastern Insurance Company ("Progressive"). Progressive denied that its policy provided bodily injury coverage for a single vehicle accident in which its named insured was the injured party; however, Progressive tendered $5,000.00

for medical payments. Clayton's parents had a policy with Allstate Insurance ("Allstate"). Stacked Pickle was insured by Erie Insurance ("Erie"). Allstate and Erie provided payments to Smith pursuant to settlement agreements. Clayton assigned any cause of action he might have against Progressive, for bad faith or other claims, to Allstate. Additionally, Smith agreed that he would not execute recovery upon Clayton's personal assets.

[9] On June 15, 2016, Smith filed a personal injury complaint against Clayton in Marion County Superior Court, seeking both compensatory and punitive damages. Allstate and Progressive intervened to provide legal representation for Clayton.[2] Clayton raised a non-party defense, naming Stacked Pickle.

[10] In January of 2017, Progressive filed a declaratory judgment in a Marion County court, seeking a declaration that it had no liability for bodily injury incurred in the single vehicle collision. In the instant matter, the trial court denied motions to stay pending resolution of the declaratory action or to bifurcate the personal injury trial. The matter proceeded to a jury trial on December 4, 2017.

[11] On December 11, 2017, the jury apportioned fault for Smith's injuries: 5% to Stacked Pickle, as a non-party, 35% to Smith, and 60% to Clayton. Smith's damages were found to be $35,000,000.00; accordingly, $21,000,000.00 was Clayton's share. The jury awarded no punitive damages. Smith was granted

---

[2] Ultimately, at least eight attorneys entered an appearance to represent a party or an intervenor.

prejudgment interest in the amount of $714,574.35, providing for a total judgment against Clayton of $21,714,574.35.

[12] Clayton filed a motion to reconsider the award of prejudgment interest and a motion to correct error. Clayton also filed a motion for post-verdict credit for advance payments, seeking $5,000.00 credit for sums paid by Progressive, and seeking credit in an amount equal to the payment received by Smith from Allstate in a confidential settlement. On February 14, 2018, the trial court conducted a hearing on the pending motions. Clayton's motions for reconsideration of prejudgment interest and correction of error were denied. Although the trial court heard argument on Clayton's motion for credit for advance payments, the parties acknowledged that resolution of the declaratory judgment was pending, and ultimately the trial court did not enter an order reducing the jury verdict against Clayton at that time. Clayton now appeals.

# Discussion and Decision

## Prior Conduct Evidence

[13] Clayton contends that the trial court's evidentiary rulings denied him a fair trial on the matter of liability. Specifically, Clayton observes that the jury – tasked with apportioning fault – learned of his prior bad conduct but did not learn of Smith's criminal history.

[14] During pretrial depositions, Clayton admitted to driving while intoxicated prior to the accident, although he had no alcohol-related arrests or convictions, and

Smith admitted to having some criminal history. Smith's criminal history, which he sought to exclude via a motion in limine,[3] consisted of one conviction each for public intoxication, reckless driving, and battery. He was on probation at the time of the accident and one probationary term required that he not consume alcohol in an illegal manner.

[15] A theory of Clayton's defense was that Smith, highly motivated to avoid further legal peril or violation of his probation, must have insisted upon Clayton driving. As such, he argued that the jury might apportion greater fault to Smith if advised of his criminal history. The trial court disagreed with Clayton's relevance argument and granted Smith's motion in limine.

[16] During Smith's case-in-chief, Clayton was called as a witness. He testified that both he and Smith had driven while intoxicated on some prior occasions. Despite defense counsel's contention that Clayton's testimony had "opened the door" to evidence of Smith's criminal history, and the trial court's indication that this "might" have happened, ultimately the criminal history was not admitted into evidence. (Tr. Vol. II, pg. 104.) In sum, the jury heard about Smith's and Clayton's prior uncharged conduct of driving while intoxicated but

---

[3] Smith requested preclusion of:

Any evidence, questions, or remarks pertaining to Plaintiff's driving record, criminal arrests, criminal charges and/or convictions, or the underlying facts related thereto; and

Any evidence, questions, or remarks related to criminal arrests, charges or convictions, including civil infractions, of Plaintiff which are not otherwise admissible under Rule of Evidence 609.

(Appellee's App. Vol. II, pg. 7.)

did not hear about Smith's convictions, one of which was alcohol-related and two of which were allegedly committed while Smith was under the influence of alcohol.

[17] A trial court exercises broad discretion in ruling on the admissibility of evidence, and an appellate court should disturb its ruling only where it is shown that the court abused its discretion. *Sims v. Pappas*, 73 N.E.3d 700, 705 (Ind. 2017). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

[18] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ind. R. Evid. 401. Pursuant to Evidence Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." "Although evidence must be relevant to be admissible, not all relevant evidence is admissible." *Sims*, 73 N.E.3d at 707.

[19] Smith contended that his and Clayton's lack of memory about the choice of driver and the absence of corroboration from bystanders rendered the jury unable to determine whether Smith influenced Clayton to drive. Accordingly, Smith claimed that his prior criminal history was not relevant to the determination of a fact in issue. Clayton argued the criminal history was

admissible to show Smith's state of mind and was evidence of his habit. Clayton also argued that the criminal history was relevant to damages, specifically, lost wages, and to punitive damages.[4]

[20] In *Sims*, our Indiana Supreme Court considered whether and under what circumstances a drunk driver's prior alcohol-related driving convictions could be introduced into evidence. The Court specified that evidence of the driver's prior convictions was "not relevant" with respect to the plaintiff's claims for compensatory damages and loss of consortium, and thus the Court addressed only whether the evidence was relative to the punitive damages claim.[5] 73 N.E.3d at 706.

[21] In performing this narrow review, the Court agreed with the Court of Appeals that "evidence of similar acts may be admissible 'because of the light which it throws on the state of mind of a person, as for example, his knowledge, motive or intent.'" *Id.* (quoting *Lindley v. Oppegaard*, 275 N.E.2d 825, 827 (1971)). The Court concluded that evidence of the driver's two prior similar acts had a

---

[4] Clayton did not seek to introduce evidence of the prior convictions to impeach Smith's testimony. Indiana Evidence Rule 609 provides the general rule and limitation in such instances: "For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime or an attempt of a crime must be admitted but only if the crime committed or attempted is (1) murder, treason, rape, robbery, kidnapping, burglary, arson, or criminal confinement; or (2) a crime involving dishonesty or false statement, including perjury."

[5] To prevail on a punitive damages claim, the plaintiff must show that the defendant subjected another person to probable injury, with an awareness of such impending danger and with heedless indifference of the consequences. *Sims*, 73 N.E.3d at 706. The tortious conduct must be marked by malice, fraud, gross negligence, or oppressiveness that is not the result of mistake of law or fact, honest judgment error, overzealousness, mere negligence or other such noniniquitous human failing. *Id.*

tendency to demonstrate whether his conduct at the time of the collision was a conscious and voluntary act committed in reckless disregard of the consequences to others. *Id.* The evidence was thus relevant within the meaning of Rule 401, but the Court "hasten[ed] to emphasize the evidence was relevant only on the issue of punitive damages." *Id.* at 706-07.

[22] However, as Clayton observes, the Court left open the question of relevance in other situations:

> Amicus curiae Indiana Trial Lawyers Association contends evidence of prior convictions is also relevant on the question of reasonable care and proximate cause, both of which are implicated in determining liability for a negligence claim. The parties do not explore this issue likely because liability was conceded. In similar fashion we decline to explore this issue as well. Instead we leave it open for another day.

*Id.* at 706, n. 5.

[23] Although Clayton broadly claims that Smith's criminal history was relevant to "throw light on his state of mind," Appellant's Brief at 14, as in *Sims*, the proximate cause of Smith's injuries was not in dispute. Nor did Clayton claim that he had acted with reasonable care; rather, he admitted some fault but stopped short of conceding that he had greater fault than Smith and non-party Stacked Pickle. As such, the issues of proximate cause and reasonable care were not the contested issues before the jury herein. The jury, which did not award punitive damages, apportioned fault and awarded compensatory damages. Given that our Supreme Court has held that a drunk driver's prior

alcohol-related convictions are not relevant to compensatory damages, it would follow that a drunk passenger's prior alcohol-related convictions are not relevant to compensatory damages. That is, Smith did not sustain greater or lesser compensable damages from the collision because he had a criminal history.[6]

[24] Thus, only the narrow question remains as to whether Smith's prior convictions might constitute "state of mind" evidence relevant to the jury's apportionment of fault under the unique circumstances of this case. We are not so persuaded. Arguably, one who had been criminally punished in the past and was actively on probation would be motivated to avoid drunk driving and might insist that another person drive instead. However, there is simply no evidence that Smith did so insist. His criminal history was not relevant to a fact "of consequence in determining the action." Evid. R. 401.[7]

[25] Clayton also claims that, as a matter of fundamental fairness, if Smith's past convictions were excluded, evidence of Clayton's past misconduct should have been excluded. Initially, we observe that Smith and Clayton were not in like

---

[6] Clayton theorized that, had Smith not been injured, Stacked Pickle management may have fired him for his drunken behavior at a company location and then argued that his lost wages could be correspondingly reduced by the jury. This theory, not based upon the actual events, is speculative. Moreover, as our Supreme Court has found prior criminal history irrelevant to compensatory damages, we are not free to carve out an exception for wages.

[7] Having determined the lack of relevance to a fact of consequence in determining the action, we do not address Clayton's argument that Smith's criminal convictions constituted evidence of his habitual conduct of drinking and getting into trouble or the argument that Smith's criminal history was somehow relevant to a determination of the punitive damages claim against Clayton.

positions. Clayton was potentially liable for punitive damages. "Admitting evidence of past similar criminal conduct allows the factfinder to determine whether defendant has learned his lesson and profited by his past experience or whether despite his past experience the defendant nonetheless engaged in a 'conscious, voluntary act or omission in reckless disregard of the consequences to another party.'" *Sims*, 73 N.E.3d 709 (quoting *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003)). That said, Smith and Clayton were deemed to be birds of a feather before the eyes of the jury, as to their willingness to drink and drive.

[26] Clayton described his typical social outings with Smith as "we were probably going to the bars a couple nights a week, and he would – would drink a lot. So I mean every – every – a couple days a week, probably, I saw him pretty intoxicated." (Tr. Vol. II, pg. 95.) Subsequently, Clayton admitted that he must have been driving at the time of the collision, although he lacked memory of that, and the following exchange ensued:

> Smith's Counsel: Well, you have – before this accident with Greg Smith, you had previously been intoxicated and been out driving vehicles, right?
>
> Clayton: We both had done it together a couple – on a couple different occasions, yes.
>
> Smith's Counsel: But that's not my question. My question is you, had [you] been out previously intoxicated and driving a vehicle, correct?

> Clayton's Counsel: Excuse me, Your Honor, I'm going to object.

(Tr. Vol. II, pg. 103.) Clayton's counsel objected only after Clayton explained that both he and Smith had driven while intoxicated and Smith's counsel asked a follow-up, clarifying question. By this point, the jury had heard the evidence of both parties' past misconduct.

[27] Clayton's remedy, albeit limited, would have been to ask for a limiting instruction in accordance with *Sims*, that is, the jury could have been instructed that they were to consider evidence of Clayton's past misconduct of drunk driving only relative to punitive damages. The request was not made. At bottom, Clayton's argument on appeal is that Smith's past criminal conduct was more egregious than Clayton's and the jury should have heard about it. But Smith's convictions were not relevant and, regardless of relevancy, the jury was informed of Smith's willingness to drink and drive. The jury was not left to apportion fault with a misleading impression that only one of the young men in the truck had such a propensity.[8] Clayton has not demonstrated an abuse of discretion in the trial court's evidentiary rulings in this regard.

## Expert or Skilled Witnesses

[28] After pre-trial depositions were taken, Clayton filed a series of motions to exclude or restrict the opinion testimony of three of Smith's anticipated expert

---

[8] Clayton also testified that Smith "would get a little aggressive when he would drink." (Tr. Vol. II, pg. 160.)

or skilled witnesses: "Motion to exclude Plaintiff's expert witness Sara Ford," "Motion to exclude Plaintiff's expert witness Ralph M. Buschbacher, M.D.," and "Motion to exclude certain testimony of Plaintiff's expert witness Debra E. Berens." (Appellant's App. at 159, 174, 204.) The trial court denied each of the motions; Clayton lodged continuing objections at trial based upon the grounds enumerated in his pretrial motions and now argues that the trial court abused its discretion by permitting the introduction of all or a portion of each challenged expert's testimony.

[29] Clayton's motion to exclude witness Sara Ford ("Ford"), a vocational economist, addressed alleged deficiencies brought to light in Ford's deposition testimony. Ford had opined that Smith was 100% disabled and concluded that he suffered a lifetime loss of earning totaling $2,150,684.00. Clayton argued that Ford had made a bald assertion as to total disability, based upon incomplete information and faulty logic. Allegedly, Ford "failed to provide an adequate foundation for her opinion that Plaintiff is 100% occupationally disabled since she reviewed an insufficient amount of data, she did not review data specific to Plaintiff's local job market, and because she used boilerplate language in her report not tailored to the Plaintiff." (*Id.* at 162.) Clayton contended that Ford had reviewed out-of-date medical records and strenuously suggested that Ford's determination of 100% vocational disability was suspect because it was not based upon a physician's like assessment or a medical records notation of 100% disability. Clayton also alleged that Ford had ignored

Smith's expressed desire to return to work and aspects of his education and work history.

[30] The trial court permitted Ford to testify and she opined that Smith was 100% occupationally disabled, and she further testified that his lost earnings amounted to $2,150,684.00 (based upon his managerial earnings at the time of the collision multiplied by 30.7 work years). On appeal, Clayton renews his argument that Ford "failed to provide an adequate foundation for her opinion that plaintiff is 100% occupationally disabled as she did not review a sufficient amount of data, she did not review data specific to plaintiff's local job market, and because she used boilerplate language in her report that was not tailored to plaintiff." Appellant's Brief at 28.

[31] The trial court acts as the gatekeeper when determining the admissibility of opinion evidence under Indiana Evidence Rule 702. *Summerhill v. Klauer*, 49 N.E.3d 175, 180 (Ind. Ct. App. 2015). Evidence Rule 702 provides:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

Under this rule, a witness may be qualified as an expert by only one of the enumerated characteristics: knowledge, skill, experience, training, or education. *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind. 2003). "It is within the trial court's sound discretion to decide whether a person qualifies as an expert witness." *Id.*

[32] Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable, and the court determines admissibility under 702(b) by considering the factors discussed in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). *Id.* A witness not qualified to offer expert testimony under Evidence Rule 702 may be qualified as a "skilled witness" or "skilled lay observer." *Id.* at 922. A skilled witness has a degree of knowledge that falls short of being declared an expert under Rule 702, but somewhat beyond that possessed by ordinary jurors. *Id.* Pursuant to Indiana Evidence Rule 701, a skilled witness may provide an opinion or inference that is "(a) rationally based on the witness's perception; and (b) helpful to a clear understanding of the witness's testimony or to a determination of a fact in issue."

[33] Clayton has not challenged Ford's credentials or qualifications to present expert or skilled witness testimony. Rather, he criticized the thoroughness of her research and observed that her assessment of 100% vocational disability had not been echoed by a physician. However, "[o]nce the admissibility of the expert's opinion is established under Rule 702, 'then the accuracy, consistency, and credibility of the expert's opinions may properly be left to vigorous cross-

examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact.'" *Estate of Borgwald v. Old Nat'l Bank*, 12 N.E.3d 252, 257 (Ind. Ct. App. 2014) (quoting *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001)).

[34] Clayton subjected Ford's methodology and conclusions to vigorous cross-examination. Confronted with the knowledge that she alone had assigned the fixed, maximum 100% numeric value, Ford testified that she had heavily relied upon the fact that Smith could not use his hands to perform a task. Clayton takes issue with the breadth of Ford's research, the methodology used to forecast lost wages, and the purported lack of corroboration of her definitive conclusion.[9] Such arguments go to the weight of the opinion testimony as opposed to its admissibility. Clayton has not demonstrated that the trial court abused its discretion by permitting Ford to testify.

[35] Regarding Dr. Buschbacher's anticipated testimony, Clayton filed a motion to exclude him as a witness, but substantively the motion sought exclusion of specific areas of testimony. That is, based upon Dr. Buschbacher's deposition testimony, Clayton considered discussion of nine potential health risks to

---

[9] Although Ford was the sole witness to state that Smith has a total vocational disability, there was not a total absence of corroboration. Dr. Scott Shapiro testified that Smith's spinal cord injuries were so extensive that he retained only some bicep function. Dr. Julie Chow testified that Smith was classified as quadriplegic. Dr. Ralph Buschbacher testified that Smith's injuries were permanent and prognosis for improvement was poor. According to Dr. Buschbacher, Smith was "not a candidate for employment" and was "truly unemployable." (Tr. Vol. IV, pg. 56.) He opined that there was an 85% to 90% chance that Smith would not be gainfully employed. Smith's mother testified that his health was not stable enough to permit him to go back to school and that he needed a caregiver to leave home.

"constitute speculation." (App. Vol. III, pg. 177.) Prior to and at trial, Clayton sought to exclude testimony he characterized as "nine opinions issued by [Dr.] Buschbacher." *Id.*

[36] At trial, Dr. Buschbacher described Smith's then-current medical conditions and diagnoses; that is, Smith had sustained a permanent spinal cord injury at the neck level, with poor prognosis for improvement, with attendant brain injury, spasticity, shoulder pain, and depression.[10] He was intellectually normal. In Dr. Buschbacher's opinion, Smith had a reduction in his life expectancy of twenty years.

[37] Over Clayton's objection, Dr. Buschbacher was permitted to describe "potential complications" of Smith's quadriplegia. (Tr. Vol. IV, pg. 57.) As for conditions for which Smith was thought to be at risk, these included complications from pressure sores, syringomyelia (enlargement of a tiny tube in the center of the spinal cord), megacolon (which could require a colostomy), renal failure, deep vein thrombosis, abnormal bone growth, accelerated cervical degenerative joint disease, cardiovascular disease/abnormalities, and orthostatic hypotension.

[38] Clayton did not challenge Dr. Buschbacher's qualifications to examine Smith, to draw conclusions based upon a reasonable medical certainty, or to assist the jury in understanding Smith's diagnosis, prognosis, and risk factors. In short, Clayton did not contest Dr. Buschbacher's qualifications as a medical expert.

---

[10] Dr. Buschbacher had examined Smith but was not one of his treating physicians.

Rather, Clayton sought to tailor the expert testimony to exclude testimony about certain risks relatively unlikely to occur.

[39] On appeal, Clayton observes that Dr. Buschbacher made certain admissions, such as: it is more likely than not that Clayton would not suffer from cardiovascular disease, predictably all persons suffer some joint degeneration in time, the chances of a bone infection, deep vein thrombosis, or syringomyelia are low, proper care could lessen the chance of renal failure to less than 10%, the occurrence of megacolon is less than 10%, and it is impossible to predict a specific risk of abnormal bone growth. These observations illustrate that Dr. Buschbacher's testimony was indeed subjected to vigorous testing of its accuracy, consistency and credibility. Dr. Buschbacher did not simply speculate as to whether some risks existed; rather, he testified that, based upon his training and experience, some risks were present to a reasonable degree of medical certainty.[11] He explained the chances that some conditions would manifest was low, some were hard to predict, and, as to at least one risk, it could not be known.[12] Dr. Buschbacher did not offer a medical opinion based upon mere speculation nor did the trial court ignore its gatekeeping function.

---

[11] Dr. Buschbacher clarified that he was more than 50% certain that Smith was at risk for complications, but this did not mean that Smith more than likely would experience a particular complication.

[12] Dr. Buschbacher differentiated between risks less likely to occur and those very likely to occur. For example, he opined that all persons who have suffered a spinal cord injury lose bone mass and that there was a very high risk of osteoporosis or osteoporatic fracture below the spinal injury site.

Clayton's arguments are directed to the weight of the evidence and not its admissibility.

[40] Finally, in his pre-trial motion, Clayton sought to exclude testimony from Debra Berens, Ph.D. ("Berens"), a life care planner, "regarding the opinions that rely on the expert opinion of an economist as they lack foundation." (App. Vol. III, pg. 205.) Berens testified that she had reviewed Smith's medical records, researched costs for services, and compiled a life care plan inclusive of such expenses as home modifications, wheelchair replacement, massage therapy, medications, psychological services, transportation, and medical care. She explained the origins of assigned costs; for example, psychological and medical providers "have been billing at that rate." (Tr. Vol. IV, pg. 136.) Some costs were derived from a national database; she looked to a Veterans Administration estimate for wheelchair accessibility home modification costs. She used current actual medication costs. Berens conceded that she "deferred to an economist for some present value calculations," *Id.* at 214, and some costs were neither adjusted for inflation nor reduced to present value. Generally, Berens used current costs multiplied by life expectancy and she suggested that "a layperson could add up" the total once costs were assigned. *Id.* at 215.

[41] The thrust of Clayton's appellate argument is that "the opinions in question admittedly require an economist and no economist testified to support the plan" and thus "Berens' report and testimony is her own admission unsupported and lack[ing] foundation and should have been excluded." Appellant's Brief at 35. He also makes a bald assertion that, as to each expense, a "personal injury"

litigant "would only be entitled to the present value of the aforementioned items under Indiana law." Appellant's Brief at 34. "Present value" has been defined as representing the present value of a sum of money to be paid over a period of years, with the discounted award consisting of an amount which would be invested to yield the future sum. *Ind. Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 368 (Ind. Ct. App. 2008). Although evidence of present value may assist the trier of fact in the determination of a reasonable award, it is not essential to an award of damages. *Id.*

[42] At bottom, Clayton's position is that Berens did not offer specialized knowledge that could help the jury understand the evidence because she is not an economist. However, Clayton does not provide authority for the propositions that only an economist can project future aggregate costs or that each individual cost must be reduced to present value for presentment to the jury. Indeed, we have acknowledged that, although present value is generally a proper consideration in determining an appropriate award, "an awareness of general inflation and a constant depreciation and cheapening of money lies within the zone of discretion given to the trier of fact in the assessment of damages." *Griffin v. Acker*, 659 N.E.2d 659, 663 (Ind. Ct. App. 1995). Clayton's preference for testimony from an economist expressed uniformly in present day values is directed to the weight of the evidence. Again, he has not demonstrated that the trial court abused its discretion by refusing to exclude Dr. Berens as a skilled witness.

# Award of Prejudgment Interest

[43] Clayton next argues that Smith was ineligible for prejudgment interest because he failed to satisfy the statutory prerequisite of making a written offer of settlement to Clayton under the Tort Prejudgment Interest Statute, Indiana Code Sections 34-51-4-1 to -9 ("the TPIS"). Clayton acknowledges that Smith sent a letter to counsel who had been retained by Progressive to pursue a declaratory judgment but asserts that the only written offer of settlement in the tort action was addressed to Allstate's counsel.[13]

[44] Pursuant to Indiana Code Section 34-51-4-6, the chapter providing for prejudgment interest does not apply if:

> (1) within one (1) year after a claim is filed in the court, or any longer period determined by the court to be necessary upon a showing of good cause, the party who filed the claim fails to make a written offer of settlement to the party or parties against whom the claim is filed;
>
> (2) the terms of the offer fail to provide for payment of the settlement offer within sixty (60) days after the offer is accepted; or

---

[13] At the hearing on motion to correct error, Clayton's counsel acknowledged that "[Smith] gave a letter to Allstate's counsel, or defendant Clayton's counsel through Allstate," but argued that "[he] did not give one to counsel for Clayton for Progressive. So, they offered to settle with Allstate. Again, it wasn't a full and complete settlement." (Tr. Vol. IV, pg. 214.)

> (3) the amount of the offer exceeds one and one-third (1 1/3) of the amount of the judgment awarded.

[45] "A prerequisite to the recovery of prejudgment interest is a settlement letter." *Alsheik v. Guerrero*, 979 N.E.2d 151, 154 (Ind. 2012). Its purpose is to afford the adverse party with notice of a claim and to provide them with an opportunity to engage in meaningful settlement. *Id.* The letter must contain the appropriate time-limiting language and the letter must be timely sent. *Id.*

[46] Smith filed suit against Clayton on June 15, 2016. On July 18, 2016, Randall Degan ("Degan") entered an appearance on behalf of Clayton and filed an answer. Degan had been retained by Allstate (who insured Clayton pursuant to his parents' insurance policy) to provide a defense for Clayton. On September 28, 2016, Smith sent a Time-Limited Settlement Demand addressed to Degan. Although Degan would subsequently be permitted to withdraw his representation, he was counsel of record for Clayton at that time. Progressive was then denying coverage; counsel retained by Progressive entered an appearance on Clayton's behalf on November 9, 2016.

[47] On March 9, 2017, Smith sent a Time-Limited Settlement Demand addressed to Thomas Vetne, counsel for Progressive who had entered an appearance in the declaratory judgment action. The demand letter stated in part:

> Your client … Progressive is defending Clayton in the personal injury action pending in the Marion County Superior Court … Cause number 49D14-1606-CT-021431; and has also initiated a Declaratory Judgment action [in] which you are representing Progressive in the Marion County Superior Court … cause

number 49D02-1701-PL-002865. Because of the dual ongoing litigation and the time and expense which will be incurred in pursuing both lawsuits, it would seem appropriate to discuss settlement of Progressive's exposure prior to incurring those costs.

(Appellee's App. Vol. II, pg. 107.)

[48] The TPIS requires that a compliant demand for settlement be made to the party or parties against whom the claim is filed. Here, the trial court found that Clayton received the requisite statutory settlement demand. Our review of the record indicates that, on September 28, 2016, Smith complied with the TPIS by making a demand for settlement upon Clayton, the sole defendant in this tort claim, through his counsel of record on that date. The sole defendant having been timely made aware of a demand for settlement, the TPIS does not require that additional entities be served with a demand letter. The trial court did not err in concluding that Smith was eligible for an award of prejudgment interest under the TPIS.

## Motion for Post-Verdict Credit

[49] In July of 2016, Smith forwarded medical bills to a Progressive claims adjuster and requested confirmation of receipt of the bills. A Progressive claims representative responded via e-mail: "To my knowledge, there is no bodily injury on this claim as it is a single vehicle accident. There is $5,000.00 of medical payments available and once that is exhausted health insurance will

pick up." (Appellee's App. Vol. II, pg. 52.) Thereafter, Progressive paid out the sum of $5,000.00.

[50] Post-trial, Clayton asserted that he was entitled to a $5,000.00 reduction of the jury award due to the Progressive payment, pursuant to Indiana Code chapter 34-44-2, which governs advance payments in a personal injury case.

[51] Indiana Code Section 34-44-2-1 provides:

> (a) This chapter applies to an action brought to recover damages for:
>
> (1) personal injuries;
>
> (2) wrongful death; or
>
> (3) property damage.
>
> (b) This chapter does not apply to actions in which there is more than one (1) defendant.

[52] Indiana Code Section 34-44-2-3 provides:

> If it is determined that the plaintiff is entitled to recover in an action described in section 1 of this chapter:
>
> (1) the defendant may introduce evidence of any advance payment made; and

(2) the court shall reduce the award to the plaintiff to the extent that the award includes an amount paid by the advance payment.

[53] The purpose of the advance payment statute is to prevent double recovery if an advance payment has been made to a plaintiff by a defendant's insurance company. *Nealy v. Am. Family Mut. Ins. Co.*, 910 N.E.2d 842, 846 (Ind. Ct. App. 2009), *trans. denied*. Apart from the advance payment statute, some policies include an explicit provision for a setoff of medical expense payments. *Id.* at 848. Where a policy permits an insurer to offset payments under medical coverage against payments under liability coverage, the insurer has the burden of establishing that a liability judgment actually included the advanced medical expenses, and no offset will be allowed where it does not sustain this burden. *Crabtree ex rel. Kemp v. Estate of Crabtree*, 837 N.E.2d 135, 142 (Ind. 2005).

[54] A typical case involving advance payments is one with an injured plaintiff in one vehicle and a tortfeasor in another, with medical payments coverage supplied by the insurer of the plaintiff's car and the relevant liability coverage insured by the tortfeasor's insurer. *Nealy*, 910 N.E.2d. at 845. In that case, an "advance payment" is one advanced by the tortfeasor's insurer as, in effect, an interim payment of potential damages for which the tortfeasor may be liable. *Crabtree*, 837 N.E.2d at 140. Reducing a judgment by the amount of an advance payment eliminates exposure of the defendant against whom the judgment is entered (as opposed to his insurer) to the amount already paid by the insurer. *Id.* The statutory definition of "advance payment" only

encompasses a payment made by a defendant or the defendant's insurance company. *Nealy*, 910 N.E.2d at 846.

[55] Here, the jury heard evidence of tortious conduct and determined that Clayton was liable to Smith. However, although Progressive provided a defense to Clayton, it did so under a reservation of rights. Progressive denied that it had an obligation to pay compensation arising from Clayton's tortious conduct. Given that the declaratory judgment was pending at the time of the post-trial hearing in this personal injury action, it had not been judicially determined that Progressive had any duty to Clayton. It had not been established that Progressive was or was not defendant Clayton's insurer. "The [advance payments] statute provides simply that payment by the defendant or his insurance company will be treated as advance payments thus reducing any judgment to the extent that the award includes an amount paid by the advance payment." *Crabtree*, 837 N.E.2d at 142. Here, the trial court was not obliged, upon argument of counsel and in the absence of further factual development,[14] to reduce the jury verdict under the advance payment statute by the $5,000.00 tendered by Progressive.

[56] Clayton also summarily claimed, at the post-trial hearing, that sums paid by Allstate to Smith pursuant to a confidential settlement should be treated, in

---

[14] There was some discussion, in a bench conference, regarding an insurance policy and whether counsel had been provided with a copy. In any event, no testimony was elicited at the hearing and no evidentiary exhibits were formally admitted into evidence.

their entirety, as advance payments offsetting the verdict. On appeal, Progressive asserts that Clayton was Allstate's insured and any payment to Smith from Allstate was to limit Clayton's liability in the tort action. Smith responds that Clayton's motion for set-off was premature and there has been no factual development as to the nature and extent of claims settled in the Allstate-Smith-Clayton settlement.[15] However, Smith seems to concede that the automobile bodily injury liability limits of the Allstate policy ($100,000.00) could likely in future litigation be deemed an advance payment to Smith on behalf of Clayton.

[57] As we have previously observed, the declaratory judgment action was pending when the trial court conducted the post-trial hearing in the personal injury case. At that hearing, argument of counsel was heard but no additional evidence was introduced. As such, we agree with Smith that Clayton did not establish his entitlement to have the jury verdict reduced at that hearing.

## Conclusion

[58] Clayton did not demonstrate an abuse of the trial court's discretion in its evidentiary rulings. The trial court did not err in finding the prejudgment interest statute to be applicable. Clayton did not establish entitlement to a

---

[15] At the post-trial hearing, Smith acknowledged that Clayton had been partially released but also asserted that Allstate had been released upon any claim that Clayton might have for negligent or wrongful claims handling. Clayton assigned to Allstate any claim that he might have against Progressive.

contemporaneous reduction of the jury verdict under the advance payment statute.

[59]    Affirmed.

Mathias, J., and Bradford, J., concur.